# WHITE MOUNTAIN APACHE TRIBE ET AL. v. BRACKER ET AL.

No. 78–1177.   Argued January 14, 1980—Decided June 27, 1980

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 170. STEVENS, J., filed a dissenting opinion, in which STEWART and REHNQUIST, JJ., joined, *post*, p. 153.

*Neil Vincent Wake* argued the cause for petitioner Pinetop Logging Co. *Michael J. Brown* argued the cause for petitioner White Mountain Apache Tribe. With them on the briefs were *Leo R. Beus* and *Kathleen A. Rihr.*

*Ian A. Macpherson,* Assistant Attorney General of Arizona, argued the cause for respondents. With him on the brief were *Robert K. Corbin,* Attorney General, and *Anthony B. Ching,* Solicitor General.

*Elinor Hadley Stillman* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne,* and *Robert L. Klarquist.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

In this case we are once again called upon to consider the extent of state authority over the activities of non-Indians engaged in commerce on an Indian reservation. The State of Arizona seeks to apply its motor carrier license and use fuel taxes to petitioner Pinetop Logging Co. (Pinetop), an enter-

prise consisting of two non-Indian corporations authorized to do business in Arizona and operating solely on the Fort Apache Reservation. Pinetop and petitioner White Mountain Apache Tribe contend that the taxes are pre-empted by federal law or, alternatively, that they represent an unlawful infringement on tribal self-government. The Arizona Court of Appeals rejected petitioners' claims. We hold that the taxes are pre-empted by federal law, and we therefore reverse.

## I

The 6,500 members of petitioner White Mountain Apache Tribe reside on the Fort Apache Reservation in a mountainous and forested region of northeastern Arizona.[1] The Tribe is organized under a constitution approved by the Secretary of the Interior under the Indian Reorganization Act, 25 U. S. C. § 476. The revenue used to fund the Tribe's governmental programs is derived almost exclusively from tribal enterprises. Of these enterprises, timber operations have proved by far the most important, accounting for over 90% of the Tribe's total annual profits.[2]

The Fort Apache Reservation occupies over 1,650,000 acres, including 720,000 acres of commercial forest. Approximately 300,000 acres are used for the harvesting of timber on a "sustained yield" basis, permitting each area to be cut every 20 years without endangering the forest's continuing productivity. Under federal law, timber on reservation land is owned by the United States for the benefit of the Tribe and cannot be harvested for sale without the consent of Congress.

---

[1] The Fort Apache Reservation was originally established as the White Mountain Reservation by an Executive Order signed by President Grant on November 9, 1871. By the Act of Congress of June 7, 1897, 30 Stat. 64, the White Mountain Reservation was divided into the Fort Apache and San Carlos Reservations.

[2] In 1973, for example, tribal enterprises showed a net profit of $1,667,091, $1,508,713 of which was attributable to timber operations.

Acting under the authority of 25 CFR § 141.6 (1979) and the tribal constitution, and with the specific approval of the Secretary of the Interior, the Tribe in 1964 organized the Fort Apache Timber Co. (FATCO), a tribal enterprise that manages, harvests, processes, and sells timber. FATCO, which conducts all of its activities on the reservation, was created with the aid of federal funds. It employs about 300 tribal members.

The United States has entered into contracts with FATCO, authorizing it to harvest timber pursuant to regulations of the Bureau of Indian Affairs. FATCO has itself contracted with six logging companies, including Pinetop, which perform certain operations that FATCO could not carry out as economically on its own.[3] Since it first entered into agreements with FATCO in 1969, Pinetop has been required to fell trees, cut them to the correct size, and transport them to FATCO's sawmill in return for a contractually specified fee. Pinetop employs approximately 50 tribal members. Its activities, performed solely on the Fort Apache Reservation, are subject to extensive federal control.

In 1971 respondents[4] sought to impose on Pinetop the two state taxes at issue here. The first, a motor carrier license tax, is assessed on "[e]very common motor carrier of property and every contract motor carrier of property." Ariz. Rev. Stat. Ann. § 40–641 (A)(1) (Supp. 1979). Pinetop is a "contract motor carrier of property" since it is engaged in "the transportation by motor vehicle of property, for compensation, on any public highway." § 40–601 (A)(1) (1974). The motor carrier license tax amounts to 2.5% of the carrier's gross receipts. § 40–641 (A)(1) (Supp. 1979). The second tax at issue is an excise or use fuel tax designed "[f]or the

---

[3] FATCO initially attempted to perform some of its own logging and hauling operations but found itself unable to do these tasks economically.

[4] Respondents are the Arizona Highway Department, the Arizona Highway Commission, and individual members of each entity.

purpose of partially compensating the state for the use of its highway." Ariz. Rev. Stat. Ann. § 28–1552 (Supp. 1979). The tax amounts to eight cents per gallon of fuel used "in the propulsion of a motor vehicle on any highway within this state." *Ibid.* The use fuel tax was assessed on Pinetop because it uses diesel fuel to propel its vehicles on the state highways within the Fort Apache Reservation.

Pinetop paid the taxes under protest,[5] and then brought suit in state court, asserting that under federal law the taxes could not lawfully be imposed on logging activities conducted exclusively within the reservation or on hauling activities on Bureau of Indian Affairs and tribal roads.[6] The Tribe agreed to reimburse Pinetop for any tax liability incurred as a result of its on-reservation business activities, and the Tribe intervened in the action as a plaintiff.[7]

Both petitioners and respondents moved for summary judgment on the issue of the applicability of the two taxes to Pinetop. Petitioners submitted supporting affidavits from the manager of FATCO, the head forester of the Bureau of Indian Affairs, and the Chairman of the White Mountain Apache Tribal Council; respondents offered no affidavits dis-

---

[5] Between November 1971 and May 1976 Pinetop paid under protest $19,114.59 in use fuel taxes and $14,701.42 in motor carrier license taxes. Since that time it has continued to pay taxes pending the outcome of this case. Refund litigation is pending in state court with respect to the five other non-Indian contractors employed by the Tribe, and that litigation has been stayed pending the outcome of this suit.

[6] For purposes of this action petitioners have conceded Pinetop's liability for both motor carrier license and use fuel taxes attributable to travel on state highways within the reservation. Pinetop has maintained records of fuel attributable to travel on those highways, and computations would evidently be made in order to allocate a portion of the gross receipts taxable under the motor carrier license tax to state highways.

[7] When Pinetop contracted to undertake timber operations for FATCO in 1969, both Pinetop and FATCO believed that it would not be required to pay state·taxes. After respondents assessed the taxes at issue, FATCO agreed to pay them to avoid the loss of Pinetop's services.

puting the factual assertions by petitioners' affiants. The trial court awarded summary judgment to respondents,[8] and the petitioners appealed to the Arizona Court of Appeals. The Court of Appeals rejected petitioners' pre-emption claim. 120 Ariz. 282, 585 P. 2d 891 (1978). Purporting to apply the test set forth in *Pennsylvania* v. *Nelson,* 350 U. S. 497 (1956), the court held that the taxes did not conflict with federal regulation of tribal timber, that the federal interest was not so dominant as to preclude assessment of the challenged state taxes, and that the federal regulatory scheme did not "occupy the field." The court also concluded that the state taxes would not unlawfully infringe on tribal self-government. The Arizona Supreme Court declined to review the decision of the Court of Appeals. We granted certiorari. 444 U. S. 823 (1980).

## II

Although "[g]eneralizations on this subject have become . . . treacherous," *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148 (1973), our decisions establish several basic principles with respect to the boundaries between state regulatory authority and tribal self-government. Long ago the Court departed from Mr. Chief Justice Marshall's view that "the laws of [a State] can have no force" within reservation boundaries, *Worcester* v. *Georgia,* 6 Pet. 515, 561 (1832).[9] See *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463, 481–483

---

[8] After the trial court entered summary judgment on the issue of the applicability of the state taxes, the case proceeded to trial on the state-law issue of the manner of calculating the motor vehicle license tax Final judgment was entered for respondents on all issues after trial. The Arizona Court of Appeals reversed the decision of the Superior Court on the calculation of the motor vehicle license tax. 120 Ariz. 282, 291, 585 P 2d 891, 900 (1978).

[9] The shift in approach is discussed in *Williams* v. *Lee,* 358 U. S. 217, 219 (1959); *Organized Village of Kake* v. *Egan,* 369 U. S. 60, 71–75 (1962); and *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 172 (1973).

(1976); *New York ex rel. Ray* v. *Martin,* 326 U. S. 496 (1946); *Utah & Northern R. Co.* v. *Fisher,* 116 U. S. 28 (1885). At the same time we have recognized that the Indian tribes retain "attributes of sovereignty over both their members and their territory." *United States* v. *Mazurie,* 419 U. S. 544, 557 (1975). See also *United States* v. *Wheeler,* 435 U. S. 313, 323 (1978); *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 55–56 (1978). As a result, there is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members. The status of the tribes has been described as " 'an anomalous one and of complex character,' " for despite their partial assimilation into American culture, the tribes have retained " 'a semi-independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' " *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 173 (1973), quoting *United States* v. *Kagama,* 118 U. S. 375, 381–382 (1886).

Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3. See *United States* v. *Wheeler, supra,* at 322–323. This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. See, *e. g., Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965); *McClanahan* v. *Arizona State Tax Comm'n, supra.* Second, it may unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them." *Williams* v. *Lee,* 358 U. S 217, 220 (1959). See also *Washington* v. *Yakima Indian Nation,* 439 U. S. 463, 502 (1979); *Fisher*

v. *District Court,* 424 U. S. 382 (1976) *(per curiam)*; *Kennerly* v. *District Court of Montana,* 400 U. S. 423 (1971). The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop," *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 172, against which vague or ambiguous federal enactments must always be measured.

The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law. Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other. The tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law. *Moe* v. *Salish & Kootenai Tribes, supra,* at 475. As we have repeatedly recognized, this tradition is reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development.[10] Ambiguities in federal

---

[10] For example, the Indian Financing Act of 1974, 25 U. S. C. § 1451 *et seq.,* states: "It is hereby declared to be the policy of Congress . . . to help develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources and where they will enjoy a standard of living from their own productive efforts comparable to that enjoyed by non-Indians in neighboring communities." Similar policies underlie the Indian Self-Determination and Education Assistance Act of 1975,

law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.  See *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 174–175, and n. 13. We have thus rejected the proposition that in order to find a particular state law to have been pre-empted by operation of federal law, an express congressional statement to that effect is required.[11]  *Warren Trading Post Co.* v. *Arizona Tax Comm'n, supra.*  At the same time any applicable regulatory interest of the State must be given weight, *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 171, and "automatic exemptions 'as a matter of constitutional law' " are unusual. *Moe* v. *Salish & Kootenai Tribes,* 425 U. S., at 481, n. 17.

When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.  See *Moe* v. *Salish & Kootenai Tribes, supra, at* 480–481; *McClanahan* v. *Arizona State Tax Comm'n.*  More difficult questions arise where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation. In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad

---

25 U. S. C. § 450 *et seq.,* as well as the Indian Reorganization Act of 1934, 25 U. S. C. § 461 *et seq.,* whose "intent and purpose . . . was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.' " *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 152 (1973), quoting H. R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934).  See also *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49 (1978).  Cf. Gross, Indian Self-Determination and Tribal Sovereignty: An Analysis of Recent Federal Policy, 56 Texas L. Rev. 1195 (1978).

[11] In the case of "Indians going beyond reservation boundaries," however, a "nondiscriminatory state law" is generally applicable in the absence of "express federal law to the contrary." *Mescalero Apache Tribe* v. *Jones, supra,* at 148–149.

policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law. Compare *Warren Trading Post Co.* v. *Arizona Tax Comm'n, supra,* and *Williams* v. *Lee, supra,* with *Moe* v. *Salish & Kootenai Tribes, supra,* and *Thomas* v. *Gay,* 169 U. S. 264 (1898). Cf. *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 171; *Mescalero Apache Tribe* v. *Jones,* 411 U. S., at 148.

## III

With these principles in mind, we turn to the respondents' claim that they may, consistent with federal law, impose the contested motor vehicle license and use fuel taxes on the logging and hauling operations of petitioner Pinetop. At the outset we observe that the Federal Government's regulation of the harvesting of Indian timber is comprehensive. That regulation takes the form of Acts of Congress, detailed regulations promulgated by the Secretary of the Interior, and day-to-day supervision by the Bureau of Indian Affairs. Under 25 U. S. C. §§ 405–407, the Secretary of the Interior is granted broad authority over the sale of timber on the reservation.[12]

---

[12] Federal policies with respect to tribal timber have a long history. In *United States* v. *Cook,* 19 Wall. 591 (1874), and *Pine River Logging Co.* v. *United States,* 186 U. S. 279 (1902), the Court held that tribal members had no right to sell timber on reservation land unless the sale was related to the improvement of the land. At the same time the Court interpreted the governing statute as designed "to permit deserving Indians, who had no other sufficient means of support, to cut . . . a limited quantity of . . . timber . . . and to use the proceeds for their support . . . , provided that 10 percent of the gross proceeds should go to the stumpage or

Timber on Indian land may be sold only with the consent of the Secretary, and the proceeds from any such sales, less administrative expenses incurred by the Federal Government, are to be used for the benefit of the Indians or transferred to the Indian owner. Sales of timber must "be based upon a consideration of the needs and best interests of the Indian owner and his heirs." 25 U. S. C. § 406 (a). The statute specifies the factors which the Secretary must consider in making that determination.[13] In order to assure the continued productivity of timber-producing land on tribal reservations, timber on unallotted lands "may be sold in accordance with the principles of sustained yield." 25 U. S. C. § 407. The Secretary is granted power to determine the disposition of the proceeds from timber sales. He is authorized to promulgate regulations for the operation and management of Indian forestry units. 25 U. S. C. § 466.

Acting pursuant to this authority, the Secretary has promulgated a detailed set of regulations to govern the harvesting

---

poor fund of the tribe, from which the old, sick and otherwise helpless might be supported." *Id.*, at 285–286.

The Attorney General interpreted the holding in *Cook* to mean that Indians had no right to reservation timber. See 19 Op. Atty. Gen. 194 (1888). This interpretation was overturned by Congress by Act of June 25, 1910, ch. 431, 36 Stat. 855, as amended, 25 U. S. C. § 407, and also repudiated in *United States* v. *Shoshone Tribe*, 304 U. S. 111 (1938). Thus, as the Court summarized in *United States* v. *Algoma Lumber Co.*, 305 U. S. 415, 420 (1939), "[u]nder . . . established principles applicable to land reservations created for the benefit of the Indian tribes, the Indians are beneficial owners of the land and the timber standing upon it and of the proceeds of their sale, subject to the plenary power of control by the United States, to be exercised for the benefit and protection of the Indians." See 25 U. S. C. § 196; *United States* v. *Mitchell*, 445 U. S. 535 (1980).

[13] Those factors include "(1) the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs, (2) the highest and the best use of the land, including the advisability and practicality of devoting it to other uses for the benefit of the owner and his heirs, and (3) the present and future financial needs of the owner and his heirs." 25 U. S. C. § 406 (a).

and sale of tribal timber. Among the stated objectives of the regulations is the "development of Indian forests by the Indian people for the purpose of promoting self-sustaining communities, to the end that the Indians may receive from their own property not only the stumpage value, but also the benefit of whatever profit it is capable of yielding and whatever labor the Indians are qualified to perform." 25 CFR § 141.3 (a)(3) (1979). The regulations cover a wide variety of matters: for example, they restrict clear-cutting, § 141.5; establish comprehensive guidelines for the sale of timber, § 141.7; regulate the advertising of timber sales, §§ 141.8, 141.9; specify the manner in which bids may be accepted and rejected, § 141.11; describe the circumstances in which contracts may be entered into, §§ 141.12, 141.13; require the approval of all contracts by the Secretary, § 141.13; call for timber-cutting permits to be approved by the Secretary, § 141.19; specify fire protective measures, § 141.21; and provide a board of administrative appeals, § 141.23. Tribes are expressly authorized to establish commercial enterprises for the harvesting and logging of tribal timber. § 141.6.

Under these regulations, the Bureau of Indian Affairs exercises literally daily supervision over the harvesting and management of tribal timber. In the present case, contracts between FATCO and Pinetop must be approved by the Bureau; indeed, the record shows that some of those contracts were drafted by employees of the Federal Government. Bureau employees regulate the cutting, hauling, and marking of timber by FATCO and Pinetop. The Bureau decides such matters as how much timber will be cut, which trees will be felled, which roads are to be used, which hauling equipment Pinetop should employ, the speeds at which logging equipment may travel, and the width, length, height, and weight of loads.

The Secretary has also promulgated detailed regulations governing the roads developed by the Bureau of Indian Affairs.

25 CFR Part 162 (1979). Bureau roads are open to "[f]ree public use." § 162.8. Their administration and maintenance are funded by the Federal Government, with contributions from the Indian tribes. §§ 162.6–162.6a. On the Fort Apache Reservation the Forestry Department of the Bureau has required FATCO and its contractors, including Pinetop, to repair and maintain existing Bureau and tribal roads and in some cases to construct new logging roads. Substantial sums have been spent for these purposes. In its federally approved contract with FATCO, Pinetop has agreed to construct new roads and to repair existing ones. A high percentage of Pinetop's receipts are expended for those purposes, and it has maintained separate personnel and equipment to carry out a variety of tasks relating to road maintenance.

In these circumstances we agree with petitioners that the federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed in this case. Respondents seek to apply their motor vehicle license and use fuel taxes on Pinetop for operations that are conducted solely on Bureau and tribal roads within the reservation.[14] There is no room for these taxes in the comprehensive federal regulatory scheme. In a variety of ways, the assessment of state taxes would obstruct federal policies. And equally important, respondents have been unable to identify any regulatory function or service performed by the State that would justify

---

[14] In oral argument counsel for respondents appeared to concede that the asserted state taxes could not lawfully be applied to tribal roads and was unwilling to defend the contrary conclusion of the court below, which made no distinction between Bureau and tribal roads under state and federal law. Tr. of Oral Arg. 34–37. Contrary to respondents' position throughout the litigation and in their brief in this Court, counsel limited his argument to a contention that the taxes could be asserted on the roads of the Bureau of Indian Affairs. Ibid. · For purposes of federal pre-emption, however, we see no basis, and respondents point to none, for distinguishing between roads maintained by the Tribe and roads maintained by the Bureau of Indian Affairs.

the assessment of taxes for activities on Bureau and tribal roads within the reservation.

At the most general level, the taxes would threaten the overriding federal objective of guaranteeing Indians that they will "receive . . . the benefit of whatever profit [the forest] is capable of yielding. . . ." 25 CFR § 141.3 (a)(3) (1979). Underlying the federal regulatory program rests a policy of assuring that the profits derived from timber sales will inure to the benefit of the Tribe, subject only to administrative expenses incurred by the Federal Government. That objective is part of the general federal policy of encouraging tribes "to revitalize their self-government" and to assume control over their "business and economic affairs." *Mescalero Apache Tribe* v. *Jones*, 411 U. S., at 151. The imposition of the taxes at issue would undermine that policy in a context in which the Federal Government has undertaken to regulate the most minute details of timber production and expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber.

In addition, the taxes would undermine the Secretary's ability to make the wide range of determinations committed to his authority concerning the setting of fees and rates with respect to the harvesting and sale of tribal timber. The Secretary reviews and approves the terms of the Tribe's agreements with its contractors, sets fees for services rendered to the Tribe by the Federal Government, and determines stumpage rates for timber to be paid to the Tribe. Most notably in reviewing or writing the terms of the contracts between FATCO and its contractors, federal agents must predict the amount and determine the proper allocation of all business expenses, including fuel costs. The assessment of state taxes would throw additional factors into the federal calculus, reducing tribal revenues and diminishing the profitability of the enterprise for potential contractors.

Finally, the imposition of state taxes would adversely affect the Tribe's ability to comply with the sustained-

yield management policies imposed by federal law. Substantial expenditures are paid out by the Federal Government, the Tribe, and its contractors in order to undertake a wide variety of measures to ensure the continued productivity of the forest. These measures include reforestation, fire control, wildlife promotion, road improvement, safety inspections, and general policing of the forest. The expenditures are largely paid for out of tribal revenues, which are in turn derived almost exclusively from the sale of timber. The imposition of state taxes on FATCO's contractors would effectively diminish the amount of those revenues and thus leave the Tribe and its contractors with reduced sums with which to pay out federally required expenses.

As noted above, this is not a case in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall. Nor have respondents been able to identify a legitimate regulatory interest served by the taxes they seek to impose. They refer to a general desire to raise revenue, but we are unable to discern a responsibility or service that justifies the assertion of taxes imposed for on-reservation operations conducted solely on tribal and Bureau of Indian Affairs roads. Pinetop's business in Arizona is conducted solely on the Fort Apache Reservation. Though at least the use fuel tax purports to "compensat[e] the state for the use of its highways," Ariz. Rev. Stat. Ann. § 28–1552 (Supp. 1979), no such compensatory purpose is present here. The roads at issue have been built, maintained, and policed exclusively by the Federal Government, the Tribe, and its contractors. We do not believe that respondents' generalized interest in raising revenue is in this context sufficient to permit its proposed intrusion into the federal regulatory scheme with respect to the harvesting and sale of tribal timber.

Respondents' argument is reduced to a claim that they may assess taxes on non-Indians engaged in commerce on the reservation whenever there is no express congressional statement

to the contrary. That is simply not the law. In a number of cases we have held that state authority over non-Indians acting on tribal reservations is pre-empted even though Congress has offered no explicit statement on the subject. See *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965); *Williams* v. *Lee,* 358 U. S. 217 (1958); *Kennerly* v. *District Court of Montana,* 400 U. S. 423 (1971). The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits. " 'The cases in this Court have consistently guarded the authority of Indian governments over their reservations.' " *United States* v. *Mazurie,* 419 U. S., at 558, quoting *Williams* v. *Lee, supra,* at 223. Moreover, it is undisputed that the economic burden of the asserted taxes will ultimately fall on the Tribe.[15] Where, as here, the Federal Government has undertaken comprehensive regulation of the harvesting and sale of tribal timber, where a number of the policies underlying the federal regulatory scheme are threatened by the taxes respondents seek to impose, and where respondents are unable to justify the taxes except in terms of a generalized interest in raising revenue, we believe that the proposed exercise of state authority is impermissible.[16]

---

[15] Of course, the fact that the economic burden of the tax falls on the Tribe does not by itself mean that the tax is pre-empted, as *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976), makes clear. Our decision today is based on the pre-emptive effect of the comprehensive federal regulatory scheme, which, like that in *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965), leaves no room for the additional burdens sought to be imposed by state law.

[16] Respondents also contend that the taxes are authorized by the Buck Act, 4 U. S. C. § 105 *et seq.,* and the Hayden-Cartwright Act, 4 U. S. C. § 104. In *Warren Trading Post Co.* v. *Arizona Tax Comm'n, supra,* at 691,

Both the reasoning and result in this case follow naturally from our unanimous decision in *Warren Trading Post Co.* v. *Arizona Tax Comm'n, supra.* There the State of Arizona sought to impose a "gross proceeds" tax on a non-Indian company which conducted a retail trading business on the Navajo Indian Reservation. Referring to the tradition of sovereign power over the reservation, the Court held that the "comprehensive federal regulation of Indian traders" prohibited the assessment of the attempted taxes. *Id.,* at 688. No federal statute by its terms precluded the assessment of state tax. Nonetheless, the "detailed regulations," specifying "in the most minute fashion," *id.,* at 689, the licensing and regulation of Indian traders, were held "to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." *Id.,* at 690. The imposition of those burdens, we held, "could . . . disturb and disarrange the statutory plan" because the economic burden of the state taxes would eventually be passed on to the Indians themselves. *Id.,* at 691. We referred to the fact that the Tribe had been "largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities." *Id.,* at 690. And we emphasized that "since federal legislation has left the State with no duties or responsibilities respecting the reservation Indians, we cannot believe that Congress intended to leave to the State the privilege of levying this tax." *Id.,* at 691. The present case, we conclude,

n. 18, we squarely held that the Buck Act did not apply to Indian reservations, and respondents present no sufficient reason for us to depart from that holding. We agree with petitioners that the Hayden-Cartwright Act, which authorizes state taxes "on United States military or other reservations," was not designed to overcome the otherwise pre-emptive effect of federal regulation of tribal timber. We need not reach the more general question whether the Hayden-Cartwright Act applies to Indian reservations at all.

is in all relevant respects indistinguishable from *Warren Trading Post.*

The decision of the Arizona Court of Appeals is

*Reversed.*

[For concurring opinion of MR. JUSTICE POWELL, see *post,* p. 170.]

MR. JUSTICE STEVENS, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST join, dissenting.

The State of Arizona imposes use fuel and motor carrier license taxes on certain businesses in order to compensate it for their greater than normal use of public roads. See *post,* at 174, n. 3 (POWELL, J., concurring). The issue originally presented to this Court was whether the State was prohibited from imposing such taxes on a non-Indian joint venture (Pinetop Logging Co.) hired by the petitioner Tribe to perform logging operations on the Fort Apache Reservation, when the taxes were based on Pinetop's use of roads located solely within the reservation. In light of the concessions made by both sides at various stages of the litigation, however, I doubt that we should reach that issue in this case. Moreover, even if the merits were properly before us, I could not agree with the Court's determination that the state taxes are pre-empted by federal law.

Between November 1971 and May 1976, Pinetop paid under protest use fuel taxes of $19,114.59 and motor carrier license taxes of $14,701.42. The Arizona Court of Appeals determined that the latter assessment improperly denied Pinetop a 60% credit to which it was entitled under state law.[1] After allowance for that credit, the total amount of the disputed taxes for the 4½-year period is reduced to about $25,000 or $5,000–$6,000 per year.

---

[1] Under Arizona law, logging operations are exempt from the motor carrier license tax if the wood they haul is used for pulpwood. In this case 60% of the logs hauled by Pinetop were to be used for pulpwood.

The taxes actually in dispute, however, are considerably less. Pinetop concedes that some of its operations are subject to tax and the State concedes that Pinetop is entitled to additional credits. To understand these concessions it is necessary to note that Pinetop's vehicles operate on four different kinds of roads within the Fort Apache Reservation: (1) state highways; (2) federally funded (Bureau of Indian Affairs) roads serving recreational public needs; (3) tribal roads exclusively financed and maintained by the Indians; and (4) private logging roads built and maintained by loggers such as Pinetop.[2]

Although Pinetop represents that its use of the Arizona state highways within the reservation is extremely limited, it does not dispute its tax liability for such use. On the other hand, in this Court the State expressly conceded that its assessments were improper under state law to the extent that they applied to operations on either private logging roads[3]

---

[2] In paragraph XIII of their complaint, petitioners alleged:

"There are four categories of roads in the Ft. Apache Indian Reservation which are used by the Plaintiffs in their logging operations: (1) tribal roads financed and maintained by the Indians exclusively; (2) federally funded (Bureau of Indian Affairs) roads serving recreational public needs; (3) state highways; and (4) logging roads built and maintained by loggers. In transporting timber from the woods to the sawmill, plaintiffs' vehicles travel substantially over tribal and BIA roads, although short portions of many of the trips are on state highways.

"The only category of roads on the Fort Apache Indian Reservation which are built or maintained by the State of Arizona, is category (3), state highways. Categories (1), (2), and (4) are financed and maintained by sources other than monies from the State of Arizona. Tribal, BIA and logging roads are not public highways within the meaning of Arizona Revised Statutes Sec. 40–601.9, and thus any use fuel and license motor carrier taxes on these roads are inappropriate."

[3] At oral argument, the Assistant Attorney General of the State of Arizona stated:

"But so long as the road remained a private thoroughfare they would not be so traveled and use of those road [sic] would not be subject to the State tax." Tr. of Oral Arg. 32.

or tribal roads.[4] If it is conceded that the State may tax Pinetop's use of public roads maintained by the State and may not tax the use of tribal or private roads, the question that arises is whether the public roads maintained by the

Later in the argument he was asked the following question and gave the following answer:

"Mr. Macpherson, quite apart from the question in this case which involves Indian tribes, what about a private owner of land—whether it is the Weyerhauseur Company or a rancher who owns many square miles of ranch land, does Arizona impose a tax upon his fuel if the vehicle that he owns is used exclusively on his own private property 365 days a year, or this year 366, and never on the public roads of Arizona?

"MR. MACPHERSON: It does not, Your Honor." *Id.*, at 39.

[4] With respect to tribal roads, the Assistant Attorney General advised the Court at oral argument:

"However, the fact of the matter is that under current State law, under the legislative scheme that exists in Arizona right now, Arizona has no intention of going forward on some purported theory that because the Court of Appeals decision says we can, that we can go ahead and tax use on these tribal roads. I have been assured of that by my client by telephone last night. And other than that we would put that before the Court to apprise the court of what the true facts are." *Id.*, at 35.

In rebuttal, counsel for petitioners expressed surprise at, but nevertheless accepted, the concession made by the State. Counsel stated:

"My good friend, Mr. Macpherson, has just said some remarkable things.

"I think I hear him saying that the State is no longer interested in collecting taxes from tribal roads on the reservation which are not Bureau of Indian Affairs roads. If that is what he said, then I am delighted to accept him accept his concession. But I must also correct some of the suggestions he has made.

"His predecessor, the Attorney for the State of Arizona, argued in the State appellate courts that the State was claiming the right to tax tribal roads. The judgment of the lower court gives the State the right to tax tribal roads. And that is the judgment we are burdened with and that is the judgment which we bring to this Court.

"Our opening briefs state that is the issue. Their briefs acknowledge that is the issue . . . and that was the issue before the Court.

. . . . .

"Trial counsel, Mr. Beus who is here, informs me over the lunch period

Bureau of Indian Affairs are more akin to the former or to the latter. It appears that the BIA roads are like the state highways insofar as they are open to use by the general public.[5] On the other hand, it also appears that they were constructed

---

that his understanding was that administrative agreement included the payment of certain taxes allocable to tribal roads.

"QUESTION: Well, as I say, that is of some importance, at least to me, whether there is an issue to taxes, either fuel or gross receipts taxes imposed on vehicles insofar as their use was confined to tribal roads.

"Is there, or is there not a dispute?

"MR. WAKE: I submit there was until Mr. Macpherson spoke.

"QUESTION: Well, now you submit there isn't. And I—

"MR. WAKE: I submit there isn't because [counsel] has conceded the issue or [is] withdrawing the issue. And perhaps he can clarify his remarks.

"QUESTION: You say you accept it gladly.

"MR. WAKE: I accept it gladly but—

"QUESTION: You have won your case on the—

"MR. WAKE: Your Honor, I would point out that that being the concession as I understand it, it would be appropriate in any event the judgment of the lower court to be correct in that regard since—" *Id.*, at 54–56.

[5] The following colloquy occurred at oral argument:

"QUESTION: What I meant to say is your real fight is over the right to tax on BIA roads.

"Does the record tell us much about those roads, for example does it tell us whether the State police are on those roads or whether they have speed limits or things like that?

"MR. MACPHERSON: Your Honor, the record does not specifically go into that much detail.

"QUESTION: However, it presents us with a hypothetical case quite different from the one you asked us to decide.

"MR. MACPHERSON: Well, Mr. Justice Stevens, the case is—we felt it necessary as an ethical consideration to apprise the Court of what the actual situation is.

"But, having said that, the issue, the legal issue, if it please the Court, may still be decided with respect to the BIA road use. The fact of the matter is that BIA roads pursuant to Federal—the Code of Federal Regulations are required to be open to free public use, as a matter of Federal law." *Id.*, at 36–37.

and maintained by the Federal Government and are policed by federal and tribal officers.[6]

Under these circumstances I think the most appropriate disposition would be to vacate the judgment of the Arizona Court of Appeals and remand for further consideration in light of the concessions made on behalf of the State in this Court. As the Court and MR. JUSTICE POWELL point out, it is difficult to see why those concessions are not an acknowledgment that the State has no authority to tax the use of roads in which it has no interest. See *ante,* at 148, n. 14 (opinion of the Court); *post,* at 174 (POWELL, J., concurring). If the state court were given an opportunity to focus on this point, we might well find that there is no remaining federal issue to be decided.

Even assuming, however, that the state courts would uphold the imposition of taxes based on the use of BIA roads, despite their similarities to private and tribal roads, I would not find those taxes to be pre-empted by federal law. In *Warren Trading Post* v. *Arizona Tax Comm'n,* 380 U. S. 685, the Court held that state taxation of a non-Indian doing business with a tribe on the reservation was pre-empted because the taxes threatened to "disturb and disarrange" a pervasive scheme of federal regulation and because there was no governmental interest on the State's part in imposing such a burden. See *Central Machinery Co.* v. *Arizona State Tax Comm'n, post,* at 168 (STEWART, J., dissenting). In this case we may assume, *arguendo,* that the second factor relied

---

[6] "QUESTION: Did I understand you to say that Arizona has no responsibility for maintaining the BIA roads?

"MR. MACPHERSON: This is correct, Your Honor.

"QUESTION: And did it contribute to the construction of those roads?

"MR. MACPHERSON: So far as the record shows, it did not, Your Honor.

"QUESTION: And no police responsibility, either?

"MR. MACPHERSON: That is correct, Your Honor. . . ." *Id.,* at 41–42.

upon in *Warren Trading Post* is present. As a result, Pinetop may well have a right to be free from taxation as a matter of due process or equal protection.[7] But I cannot agree that it has a right to be free from taxation because of its business relationship with the petitioner Tribe.

As the Court points out, the Federal Government has imposed a detailed scheme of regulation on the tribal logging business. Thus, among other things, the BIA approves and sometimes drafts contracts between the Tribe and non-Indian logging companies such as Pinetop and requires the Tribe and its contractors to follow BIA's dictates as to where to cut, haul, and mark timber, and as to which roads to construct and repair. *Ante,* at 148, n. 14. The Court reasons that, because the imposition of state taxes on non-Indian contractors is likely to increase the price of their services to the Tribe and thus decrease the profitability of the tribal enterprise, the taxes would substantially interfere with this scheme. Thus, the Court states that the taxes threaten the "overriding federal objective" of guaranteeing Indians all the profits the forest is capable of yielding, "undermine" the Federal Government's ability to set fees and rates with respect to non-Indian contractors, and "adversely affect the Tribe's ability to comply with the sustained-yield management policies imposed by federal law." *Ante,* at 149–150.

From a practical standpoint, the Court's prediction of massive interference with federal forest-management programs seems overdrawn, to say the least. The logging operations involved in this case produced a profit of $1,508,713 for the Indian tribal enterprise in 1973. As noted above, the maximum annual taxes Pinetop would be required to pay would

---

[7] The Due Process Clause may prohibit a State from imposing a tax on the use of completely private roads if the tax is designed to reimburse it for use of state-owned roads. Or it may be that once the State has decided to exempt private roads from its taxing system, it is also required, as a matter of equal protection, to exempt other types of roads that are identical to private roads in all relevant respects.

be $5,000–$6,000 or less than 1% of the total annual profits. Given the State's concession in this Court that the use of certain roads should not have been taxed as a matter of state law, the actual taxes Pinetop would be required to pay would probably be considerably less.[8] It is difficult to believe that these relatively trivial taxes could impose an economic burden that would threaten to "obstruct federal policies."

Under these circumstances I find the Court's reliance on the indirect financial burden imposed on the Indian Tribe by state taxation of its contractors disturbing. As a general rule, a tax is not invalid simply because a nonexempt taxpayer may be expected to pass all or part of the cost of the tax through to a person who is exempt from tax. See *United States* v. *Detroit,* 355 U. S. 466, 469; cf. *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134. In *Warren Trading Post* the Court found an exception to this rule where Congress had chosen to regulate the relationship between an Indian tribe and a non-Indian trader to such an extent that there was no room for the additional burden of state taxation. In this case, since the state tax is unlikely to have a serious adverse impact on the tribal business, I would not infer the same congressional intent to confer a tax immunity. Although this may be an appropriate way in which to subsidize Indian industry and encourage Indian self-government, I would require more explicit evidence of congressional intent than that relied on by the Court today.

I respectfully dissent.

---

[8] The parties have not told us what portion of the taxes is attributable to the use of each of the various types of roads. Thus, we cannot determine how much tax Pinetop would be required to pay for its use of BIA roads.