754 P.2d 308

**NEUMANN CARIBBEAN INTERNATIONAL, LTD., Plaintiff-Appellant,**

**v.**

**ARIZONA DEPARTMENT OF REVENUE, Defendant-Appellee.**

**No. 1 CA-CIV 9222.**

Court of Appeals of Arizona,
Division 1, Department A.

Nov. 24, 1987.

Review Granted June 7, 1988.

Steven M. Friedman, Phoenix, for plaintiff-appellant.

Robert K. Corbin, Atty. Gen. by J. Scott Halverson, Asst. Atty. Gen., Phoenix, for defendant-appellee.

## OPINION

GREER, Judge.

This appeal raises the question of whether transaction privilege taxes paid without protest may be refunded to the taxpayer because the Department of Revenue had no semblance of authority to collect the tax. The trial court entered summary judgment in favor of the Department of Revenue, holding that taxes paid cannot without protest be refunded. We affirm the trial court.

The facts are undisputed.[1] Plaintiff-appellant Neumann Caribbean International, Ltd. (Neumann) was engaged exclusively in the business of constructing homes for Indians on the San Carlos and Colorado Indian Reservations from October 1, 1978, through September 30, 1981. The contracts Neumann entered into with the respective Indian housing authorities required compliance with federal law and regulations concerning such construction.

The Arizona Department of Revenue (Department) audited Neumann for the period of August 1, 1978, through September 30, 1981. As a result of the audit, the Department issued a deficiency assessment requiring Neumann to pay additional transaction privilege taxes in the amount of $18,464.98, plus a penalty and interest for a total of $24,627.37. The assessment resulted from the Department's disallowance of certain deductions previously claimed by Neumann. Neumann protested the assessment and requested a hearing, which was concluded on June 3, 1983.

On July 2, 1982, the United States Supreme Court decided *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982). That case held that federal law preempts state law imposing a tax on the gross receipts a non-Indian construction company receives from a tribal school board for the construction of a school on an Indian reservation. The Department acknowledges that, for tax periods subsequent to July 2, 1982, it lacks the authority to collect transaction privilege taxes from companies such as Neumann who construct housing for Indians on Indian reservations, whether or not the tax was paid under protest. The Department further acknowledges that for periods prior to July 2, 1982, any assessment for taxes would be abated if paid under protest by the taxpayer. Lastly, the Department waived the deficiency it originally assessed against Neumann.

Subsequent to the *Ramah* decision, Neumann amended its protest to the original assessment and claimed a refund of $165,673.95, the total amount of transaction privilege taxes it paid throughout the years in question. The Department refused to refund the amount claimed, arguing that Neumann waived its right to claim a refund because the taxes had not been paid under protest as required by state law.

---

1. The parties had agreed that the case could be decided by summary judgment based upon a joint statement of facts.

At the June 3, 1983, hearing, Neumann filed an affidavit signed by its president, setting forth its objections to the legality of the tax and demanding a refund. The hearing officer issued a decision on June 14, 1983, denying the refund because of Neumann's failure to pay the taxes under protest. The Director of the Department sustained the hearing officer's decision on October 17, 1983, stating that at the time the taxes were paid without protest, the Department had a semblance of authority to collect the tax. Neumann timely appealed to the State Board of Tax Appeals, which upheld the Director's order on May 6, 1985.

Neumann appealed to the superior court, which granted summary judgment in favor of the Department, upholding its decision denying a refund of the transaction privilege taxes paid. Neumann timely appealed to this court.

The essence of Neumann's appeal is that because of the *Ramah* decision and preceding case law, the Department had no semblance of authority to collect transaction privilege taxes from Neumann during the period in question. Therefore, the fact that Neumann paid the taxes without protest should not bar a refund of the taxes paid. The Department responds that the taxes were collected under a semblance of authority which did not disappear until the date of the *Ramah* decision and therefore the taxes cannot be refunded because they were paid voluntarily and not under protest, as required by A.R.S. § 42–1339.

Before reaching these issues, we briefly address the impact of *Ramah* on the Department's authority to collect transaction privilege taxes from companies such as Neumann. In *Ramah,* the United States Supreme Court unequivocally held that states do not have the authority or jurisdiction to tax transactions taking place on Indian reservations between non-Indian contractors and tribal organizations. *Ramah* involved a non-Indian contractor who contracted with a tribal school board to construct schools on an Indian reservation. The New Mexico Court of Appeals held that the gross receipts tax imposed by New Mexico was permissible. The United States Supreme Court reversed this holding in a 6–3 decision in which it relied heavily upon its earlier decision, *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

*White Mountain* arose out of Arizona's attempted taxation of a company conducting business exclusively on an Indian reservation. The petitioner was a non-Indian company which cut timber exclusively on the Fort Apache Reservation and transported it to the tribe's sawmill. Arizona attempted to impose a motor carrier license tax, which is based upon a carrier's gross receipts, and a use fuel tax, which is based upon the amount of diesel fuel used on highways within the state, upon the petitioner's operations. The petitioner paid the taxes under protest and filed suit alleging the taxes were preempted by federal law. The United States Supreme Court held that the Arizona taxes were preempted by federal law.

■ As noted previously, the Department concedes that the *Ramah* decision unequivocally prevents it from imposing or collecting transaction privilege taxes from non-Indian companies who contract with Indian tribal authorities to construct housing on Indian reservations. The question thus becomes whether the Department had a semblance of authority to collect the tax prior to the *Ramah* decision in light of the earlier *White Mountain* decision. Before addressing this issue, we first consider Neumann's position that a protest under A.R.S. § 42–1339(B) was not a prerequisite to its claim for a refund.

A.R.S. § 42–1339(B) provides, in pertinent part:

> After payment of any tax, penalty or interest under protest verified by oath and setting forth the grounds of objection to the legality of the tax, a taxpayer may bring action against the department in any superior court of the state for the recovery of the tax, interest or penalty so paid under protest.... No grounds of illegality of a tax shall be considered by the court other than those set forth in

the protest filed at the time payment is made....[2]

Neumann claims it is entitled to a refund of taxes paid without protest pursuant to A.R.S. § 42–1326. That section provides that excess taxes paid can be credited or refunded to the taxpayer.[3] Our courts have consistently held, however, that excess taxes claimed under A.R.S. § 42–1326 must be *paid under protest*, pursuant to § 42–1339, to entitle the taxpayer to a credit or refund.

In *Swift & Co. v. State Tax Comm'n*, 105 Ariz. 226, 462 P.2d 775 (1969), the Arizona Supreme Court held that the taxpayer could not recover transaction privilege or education excise taxes paid without protest even though the court determined the taxes to be unauthorized. The court did allow, however, a refund of a portion of the transaction privilege tax which had been paid under protest after the state tax commission had assessed a deficiency.

In *Moore Business Forms, Inc. v. State Tax Comm'n*, 9 Ariz.App. 14, 448 P.2d 886 (1968), this court held that transaction privilege taxes unlawfully levied by the Arizona Tax Commission, but paid without protest, were not refundable under § 42–1326 when the tax commission had a "semblance of authority" to collect the tax. The taxpayer, an out-of-state printer, had paid a higher retail sales tax than in-state printers. The Arizona Supreme Court determined, however, that all persons engaged in job printing should be taxed at the same rate, prompting the taxpayer to seek a refund for the taxes it had previously paid. *See Standard Register Company v. State Tax Comm'n*, 93 Ariz. 234, 379 P.2d 904 (1963). The court of appeals held that the provision of A.R.S. § 42–1339(B) requiring that taxes be paid under protest must be strictly followed. *Moore Business Forms,*

9 Ariz.App. at 15, 448 P.2d at 887. The court noted that "[e]xceptions to the general rule of nonrecovery of taxes paid without protest have been narrowly circumscribed in this state." *Id. See also, Southern Pacific Co. v. Cochise County*, 92 Ariz. 395, 377 P.2d 770 (1963); *Smotkin v. Peterson*, 73 Ariz. 1, 236 P.2d 743 (1951); *Bodco Building Corp. v. State Tax Comm'n*, 5 Ariz.App. 589, 429 P.2d 476 (1967); Arizona Tax Ruling No. 2–0–80.

An exception to this principle can be found in *Maricopa County v. Leppla*, 89 Ariz. 220, 360 P.2d 227 (1961), in which the court allowed a refund for a tax that had been mistakenly paid twice by the taxpayer *without* protest. The court stated:

> This is not a case where a tax obligation actually *existed* after the original payment by the taxpayer had been made. The second payment was purely gratuitous and constituted a receipt by the tax authority of money which it had not anticipated in any manner whatsoever, and for which there existed no obligation. Under no theory, of mistake or otherwise, was the taxpayer or its agent required to satisfy a non-existent obligation. Under these circumstances, we are of the opinion that the reason for denying a taxpayer the right to recover taxes paid under mistake of fact which he might have ascertained and called to the attention of the taxing authorities before payment does not exist. ...

89 Ariz. at 223, 360 P.2d at 230 (emphasis in original). In this case, the payment for which Neumann seeks a refund was made pursuant to an obligation to pay the tax in question.

Arizona case law is clear—a tax must be paid under protest to entitle a taxpayer to a refund.[4] The only exception, other than perhaps a *gratuitous* payment such as in

---

2. A.R.S. § 42–1339 was repealed, Laws 1985, Ch. 366, effective July 1, 1986. It was replaced by A.R.S. § 42–124.

3. A.R.S. § 42–1326 was repealed, Laws 1985, Ch. 366, effective July 1, 1986. It was replaced by A.R.S. § 42–129.

4. *But see Pittsburgh & Midway Coal Co. v. Arizona Dept. of Revenue*, 156 Ariz. 568, 754 P.2d

295 (Ariz.App.1987), in which Division Two held that DOR must refund use taxes *erroneously* paid without protest. The court determined that cases construing A.R.S. §§ 42–1326 and –1339, *e.g., Swift & Co.*, were not controlling because of the differing statutory language. Those cases are controlling here, however, since they concern the same statutes at issue in this case.

*Leppla,* is if the taxing authority had no semblance of authority to collect the tax in the first place. *Moore Business Forms,* 9 Ariz.App. 14, 448 P.2d 886.[5]

Neumann further argues that § 42–1339 is vague and ambiguous and therefore must be strictly construed against the taxing authority. *Department of Revenue v. Southern Union Gas Co.,* 119 Ariz. 512, 582 P.2d 158 (1978). Specifically, Neumann points out that the statute does not set forth the manner, means or time for making a protest.

Admittedly, the statute is not specific in exactly how a protest must be made. It expressly requires, however, that a protest be verified by oath and set forth the grounds of objection to the legality of the tax. It states: "[n]o grounds of illegality of a tax shall be considered by the court other than those *set forth in the protest filed at the time payment is made....*" (Emphasis added.) The statute is neither vague nor ambiguous about *when* a protest must be made—at the time the disputed tax is paid. Any possible questions concerning the time of protest are laid to rest by the case law previously discussed which held that taxes must be paid under protest to entitle the taxpayer to a refund.

Neumann nevertheless suggests that it complied with the protest requirements of § 42–1339(B) when it filed the affidavit setting forth its grounds of objection to the legality of the tax at the June 3, 1983, hearing. This attempted protest clearly did *not* comply with the requirement that a protest be made when the tax is paid. Protest requirements must be *strictly* followed. *Moore Business Forms,* 9 Ariz.App. 14, 448 P.2d 886.

Neumann also argues that A.R.S. § 42–1338.01(B) expressly recognizes the taxpayer's right to seek a refund from the Department under § 42–1338 without filing a protest under § 42–1339(B). Section 42–1338.01(B) provides that the state may "bring an action in superior court within thirty days after the board's [State Board of Tax Appeals] decision has become final,

to determine the validity of its deficiency assessment or denial of the taxpayer's claim for a refund." Neumann suggests that if the Department may appeal when the State Board of Tax Appeals overrules its denial of a taxpayer's refund, the taxpayer is also permitted to seek a refund "in the first instance" under § 42–1338. Neumann further points out that under § 42–1338, the section allowing a taxpayer to appeal to the State Board of Tax Appeals, there is no requirement that the tax be paid under protest to obtain a refund under § 42–1338.01(B).

Neumann's arguments are flawed. Section 42–1338 sets forth the requirement for a tax debtor to request a hearing, correction or redetermination of a deficiency assessed by the Department under § 42–1327. Section 42–1338.01 allows the taxpayer to appeal to the State Board of Tax Appeals if he is unsatisfied with the outcome of the hearing, correction or redetermination. Subsection (B) provides:

> Upon determining the appeal, the state board shall issue a decision consistent therewith, which shall become final thirty days after receipt of notice thereof by the taxpayer. Any additional tax due shall be paid within thirty days after the board's decision has become final, *but without prejudice to the right of petitioner to pay the tax under protest and to bring an action within thirty days as provided in § 42–1339.* The state may also bring an action in superior court within thirty days after the board's decision has become final, to determine the validity of its deficiency assessment or denial of the taxpayer's claim for refund.

A.R.S. § 42–1338.01(B) (emphasis added).

The foregoing sections apply to deficiencies assessed by the Department as opposed to the situation, as here, where the taxpayer voluntarily paid a tax and then seeks a refund. Further, under these sections, the taxes must also be *paid under protest* to enable the taxpayer to pursue his next remedy, which is to file an action in superior court. A.R.S. § 42–1338.01(B).

---

**5.** *See* discussion, *infra.*

Section 42–1339, however, applies to the payment of "any" tax "under protest," thus including both deficiencies and over-payments.[6]

Neumann also contends that the Department put the taxes paid in question by opening those years to an audit. Since the years were reopened for an additional assessment, Neumann argues it should also be entitled to a refund. The only support Neumann cites for this proposition is *International Health & Life Insurance Co. v. Department of Revenue*, 269 Or. 23, 523 P.2d 223 (1974), which is inapposite to this case. *International Health* involved the reopening of a statute of limitations period which had expired. In contrast, Neumann seeks to reopen a tax period for which it was never entitled to a refund because of its failure to pay the tax under protest. Neumann cites no Arizona law to otherwise support its contention.

■ Finally, Neumann argues that a protest need not be made to recover taxes paid when there was no semblance of authority to collect the tax in the first place. *E.g., Moore's Business Forms*, 9 Ariz. App. 14, 448 P.2d 886. Here, it argues, the Department had no semblance of authority for the period in question under *White Mountain Apache Tribe v. Bracker*, which was decided by the United States Supreme Court in June of 1980, over two years prior to the *Ramah* decision. Neumann suggests that the Department should have known and realized the implications of *White Mountain*. The Department counters that there was no clear indication that transaction privilege taxes were preempted by federal law in the precise situation presented here until the *Ramah* decision was handed down, thus creating, at the very least, a semblance of authority to collect the tax. We agree with the Department for the reasons set forth below.

At the outset, we observe that Neumann's argument about the clear applicability of *White Mountain* to this type of tax rings slightly hollow given the fact Neumann continued to pay the taxes without protest after that decision. Apparently, even the taxpayer believed the Department retained its authority to impose the tax.

Additionally, we note that there is no preemptive bar against the Department collecting taxes from non-Indians on the reservation, and the Department continues to do so in a number of circumstances. The question presented here is whether there was authority to collect this specific transaction privilege tax, not whether there is authority to generally tax non-Indians on the reservation.

The Department has no semblance of authority to assess a tax if "the imposition of the tax is blatantly illegal." *Shew v. Jeffers*, 147 Ariz. 192, 193, 709 P.2d 549, 550 (App.1985). *See also, State ex rel. Lane v. Superior Court*, 72 Ariz. 388, 236 P.2d 461 (1951); *Nelssen v. Electrical District No. 4*, 60 Ariz. 175, 133 P.2d 1013 (1943).

In essence, Neumann's position is that, in light of *White Mountain*, this type of tax is clearly unlawful. Until *Ramah*, however, federal preemption of state taxation on Indian reservations was not nearly as obvious as Neumann suggests.

Although several cases prior to and including *White Mountain* indicated a trend toward federal preemption, a careful reading of each of these cases indicates that the preemption question was decided on a case-by-case basis. The final determination in these cases rested upon each set of particular facts, a consideration of the nature of

---

**6.** Neumann cites *Merchants Despatch Corp. v. State Tax Comm'n*, 20 Ariz.App. 276, 512 P.2d 39 (1973), at least twice for the proposition that, in the absence of a statute to the contrary, a tax paid may be recovered even if no protest was made at the time of the payment. Arizona does, however, have such a statute, as was acknowledged by the court in *Merchants:*

> Generally speaking, in the absence of a statute to the contrary, a tax paid involuntarily may be recovered even though no protest was made at the time of payment.... *Arizona has chosen, however, to require both the involuntariness of the payment and that there be a protest....*
> 20 Ariz.App. at 280, 512 P.2d at 43 (emphasis added) (citations omitted).

the tax imposed, the tribal interests implicated, and the degree of federal regulation involved. *See Warren Trading Post Co. v. State Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *McClanahan v. State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Thus, in *White Mountain,* the Supreme Court stated:

> This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

448 U.S. at 146, 100 S.Ct. at 2584 (citations omitted). After a thorough analysis of those factors, the Court concluded: *"In these circumstances,* we agree with petitioners that the federal regulatory scheme is so persuasive as to preclude the additional burdens sought to be imposed in this case." 448 U.S. at 148, 100 S.Ct. at 2586 (emphasis added).

The decision in *Ramah* reaches beyond these earlier cases. Although the *Ramah* court berates state courts and, more specifically, the New Mexico Court of Appeals for failing to adhere to the principles set forth in *White Mountain,* for the first time, it clarifies the Supreme Court's intent that federal preemption and the justification for it be applied more broadly than on a case-by-case method.

> Although we must admit our disappointment that the courts below apparently gave short shrift to this principle and to our precedents in this area, we cannot and do not presume that state courts will not follow *both the letter and the spirit of our decisions in the future.*

458 U.S. at 846, 102 S.Ct. at 3403 (emphasis added).

Prior to *Ramah,* it was not unreasonable to interpret *White Mountain* and other earlier decisions as being limited to the precise facts in each case. The *Ramah* decision, for the first time, clearly enunciated the Court's intent that consideration must be afforded these factors in situations other than those already specifically addressed by the Court. We note, however, that the Court specifically rejected a "presumption of preemption" approach and reaffirmed the need to view each case individually. *Ramah,* 458 U.S. at 845–46, 102 S.Ct. at 3402–03.

When reasonable minds can differ on the legality of a tax, imposition of the tax cannot be considered "blatantly illegal." The disagreement in existence after *White Mountain* is evidenced by the fact that three United States Supreme Court Justices disagreed with the *Ramah* majority that *White Mountain* was controlling and that the New Mexico Court of Appeals had failed to follow that precedent. *Ramah,* 458 U.S. at 847, 102 S.Ct. at 3403 (Rehnquist, J., dissenting).[7] Given this uncertainty and disagreement, we refuse to find that this tax was blatantly illegal. Accordingly, we conclude that the *White Mountain* decision did not strip the Department of its semblance of authority to impose the tax.

The trial court is affirmed.

GRANT and FROEB, JJ., concur.

---

7. Even Neumann acknowledges this uncertainty when it states that in *Ramah,* "the United States Supreme Court laid to rest the question of whether or not the State had authority and jurisdiction to tax transactions taking place on Indian reservations...." Appellant's Opening Brief at 7.