## THE CASANOVA CLUB *v.* VICTOR H. BISHARAT (10703)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued February 1—decision released April 5, 1983

*Miles F. McDonald, Jr.,* with whom, on the brief, was *Francine J. Morris,* for the appellant (plaintiff).

*David M. Cohen,* with whom, on the brief, was *Steven Berglass,* for the appellee (defendant).

PETERS, J. The principal question in this case is the extent to which the Connecticut policy against the enforcement of gambling debts serves to shield

a debtor from his obligation to pay checks issued in a foreign country where such debts are not illegal. The plaintiff, The Casanova Club, brought an action against the defendant, Victor H. Bisharat, the drawer of nine dishonored checks in the total amount of 6350£. The defendant replied with an answer and a special defense relying on General Statutes § 52-553.[1] Once the pleadings were closed, the parties filed cross motions for summary judgment. The plaintiff appeals from the denial of its motion for summary judgment and the granting of the defendant's motion.

The underlying facts are undisputed. The defendant, while in Great Britain in early 1976, became a member of the plaintiff, The Casanova Club, a British corporation operating a legal gambling casino in London. Gambling at the plaintiff club was carried on through the use of gambling chips redeemable at the club in local currency at any time. The defendant, over a period of several months, signed, as drawer, nine bearer checks totalling 6350£ to obtain from the plaintiff an equivalent amount of gambling chips, all of which he gambled and lost. His checks, presented for payment to the designated drawee, Hartford National Bank, were returned to the plaintiff with the notation "unpaid for reason: insufficient funds." The

[1] "[General Statutes] Sec. 52-553. WAGERING CONTRACT VOID. All wagers, and all contracts and securities whereof the whole or any part of the consideration is money or other valuable thing won, laid or betted, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void, provided nothing herein contained shall affect the validity of any negotiable instrument held by any person who acquired the same for value and in good faith without notice of illegality in the consideration."

plaintiff, as holder of these dishonored checks, then brought the present action against the defendant pursuant to General Statutes § 42a-3-413 (2).[2] The defendant maintains an office in this state.

The trial court concluded that the defendant was entitled to prevail on his motion for summary judgment because of "the State's long standing public policy against gambling and a statute prohibiting the enforcement of claims arising out of gambling transactions. [General Statutes § 52-553]" This public policy against the enforcement of gambling debts outweighed, according to the trial court, the principle of conflicts of law which generally favors enforcement of contracts if valid where made.

The plaintiff has raised three grounds of error in support of its argument that it, and not the defendant, was entitled to summary judgment as a matter of law. The plaintiff maintains that it was entitled to recover: (1) because of rights conferred by article 3 of the Uniform Commercial Code, § 42a-3-101 et seq.; (2) because the action is not one to enforce a gambling debt; and (3) because there is no violation of Connecticut public policy. The plaintiff has made no claim that a genuine issue as to a material fact makes this case inappropriate for disposition by summary judgment. See Practice Book § 384; *Telesco* v. *Telesco,* 187 Conn. 715, 718–19, 447 A.2d 752 (1982). We find no error.

[2] General Statutes § 42a-3-413 (2) provides: "CONTRACT OF MAKER, DRAWER AND ACCEPTOR. . . . (2) The drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder or to any endorser who takes it up. The drawer may disclaim this liability by drawing without recourse."

## I

The plaintiff's claims under our negotiable instruments law are governed by principles set down by the Uniform Commercial Code. Under the Code, a drawer, a person who issues checks, engages that, upon their dishonor and due notice of such dishonor, he will pay their face amount to their holder. General Statutes § 42a-3-413 (2). A drawer is not, however, absolutely liable, and may interpose defenses to his liability. General Statutes § 42a-3-307 (2). Once the drawer has "shown that a defense exists," a person claiming the rights of a holder in due course has the burden of establishing his due course status. General Statutes § 42a-3-307 (3). Even a holder in due course, however, does not take checks free of the defenses of a party to the checks with whom the holder has dealt. General Statutes § 42a-3-305 (2). See generally White & Summers, Uniform Commercial Code (2d Ed. 1980) §§ 13-9, 14-9, 14-10.

Applying these statutory mandates to the present case, we conclude that the plaintiff, either as a holder or a holder in due course, can recover the face amounts of the nine checks issued by the defendant only if the defendant cannot establish his defense of illegality. It is undisputed that there was direct dealing between the plaintiff and the defendant with regard to the gambling transactions out of which the checks arose. In the present circumstances, therefore, the plaintiff's reliance on the policy of promoting unencumbered transferability of negotiable instruments is misplaced, since the Uniform Commercial Code, in cases of direct dealing between immediate parties, expressly subjects even due course holders to real and personal

defenses. See *Condado Aruba Caribbean Hotel, N.V.* v. *Tickel,* 39 Colo. App. 51, 53, 561 P.2d 23 (1977); *Wilmington Trust Co.* v. *Delaware Auto Sales,* 271 A.2d 41, 42 (Del. 1970); *James Pair, Inc.* v. *Gentry,* 134 Ga. App. 734, 735, 215 S.E.2d 707 (1975); *Chicago Title & Trust Co.* v. *Walsh,* 34 Ill. App. 3d 458, 468-69, 340 N.E.2d 106 (1975); *K-Ross Building Supply Center, Inc.* v. *Winnipesaukee Chalets, Inc.,* 121 N.H. 575, 580, 432 A.2d 8 (1981); *Brotherton* v. *McWaters,* 438 P.2d 1, 4 (Okla. 1968); *Bucci* v. *Paulick,* 277 Pa. Super. 492, 496-97, 419 A.2d 1255 (1980); *Estate of Lucas* v. *Whiteley,* 550 S.W.2d 767, 769 (Tex. Civ. App. 1977). The law of negotiable instruments therefore provides no basis for overturning the judgment rendered by the trial court.

## II

The plaintiff's second claim of error is that enforcement of these checks is not illegal because their issuance does not fall within the prohibitions of General Statutes § 52-553. The plaintiff argues that these checks neither represent "contracts . . . whereof the whole or any part of the consideration is money or other valuable thing won, laid or betted, at any game . . . or pastime" nor "contracts . . . of such game . . . or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers." Because the defendant received gambling chips for his checks, rather than cancelled I.O.U.'s for debts incurred while gambling, the plaintiff maintains that the checks are not wagering contracts. We do not agree.

It is true that the defendant had no contract to gamble, and was under no other obligation to

do so. In theory he was free at any time to convert his gambling chips either to local currency or to some other equivalent of cash. In fact, however, the transaction as a whole was designed to enable him to gamble at the plaintiff club. No evidence has been presented that suggests either a temporal or a geographic gap between his acquisition of gambling chips and his use of them at the gaming tables. Under these circumstances, it is reasonable to presume that the opportunity to gamble was part of the consideration for the furnishing of gambling chips to the defendant. See *National Recovery Systems* v. *Ornstein,* 541 F. Sup. 1131, 1134 (E.D. Pa. 1982). In the alternative, the defendant's conditional engagement to make good any check that his bank dishonored may also be considered a contract to repay moneys knowingly lent by the plaintiff to enable the defendant to gamble.

The plaintiff might have made a stronger argument that § 52-553 does not apply had the plaintiff properly invoked the statutory proviso that protects "the validity of any negotiable instrument held by any person who acquired the same for value and in good faith without notice of illegality in the consideration." Although in its appellate brief the plaintiff maintains that "there could be no 'notice of illegality' to taint the negotiability and enforceability of the checks," the absence of notice is raised in none of the pleadings in the trial court. A notice question ordinarily raises a question of fact inappropriate for resolution by summary judgment. See *Vilella* v. *McGrath,* 136 Conn. 645, 649, 74 A.2d 187 (1950). Having failed to raise the issue of notice in the trial court, having indeed consistently insisted that this case is ripe for summary judgment, the plaintiff cannot for the first time in

this court rely on an argument depending upon an unconceded factual assertion on which it bears the burden of proof. Cf. General Statutes § 42a-3-307 (3). Without some basis in the record to support its statement that it acquired the defendant's checks "without notice of illegality in the consideration," the plaintiff cannot invoke the exculpatory proviso of § 52-553. See *Weil* v. *Miller*, 185 Conn. 495, 502, 441 A.2d 142 (1981).

### III

The plaintiff's final claim of error is that the defendant's purchase of gambling chips is not so offensive to Connecticut public policy as to bar suit on the checks that he issued. In part, this claim merely reiterates the proposition, which we have already rejected, that the defendant's purchase of chips was severable from any gambling debt or contract, and thus not forbidden by our statute. The plaintiff further suggests that our public policy against gambling, which we have acknowledged to be "ancient and deep-rooted"; *Ciampittiello* v. *Campitello*, 134 Conn. 51, 56, 54 A.2d 669 (1947); has become so attenuated that it should not be applied to bar recovery for a transaction valid under British law.

It is undisputed that the gambling activities that took place at the plaintiff's casino were legal under the laws of Great Britain.[3] Had the plaintiff pursued its claim to judgment in Great Britain, our courts could have permitted recovery on that judg-

---

[3] The defendant has not pursued its preliminary statement of issues in opposition to the appeal, namely that the record contains no evidence that gambling obligations are enforceable in Great Britain. The trial court in its memorandum of decision "noted that gambling activities to which reference is made herein are legal in Great Britain."

ment here. See *Hilton International Co.* v. *Arace,* 35 Conn. Sup. 522, 527–30, 394 A.2d 739 (1977).

It is equally clear that our General Assembly has made substantial inroads into the public policy against gambling. The legislature has sanctioned activities such as lotteries; General Statutes § 12-568; off-track and parimutuel betting; General Statutes §§ 12-571 and 12-572; and jai alai frontons; General Statutes § 12-573a. None of these statutes, however, permits gambling on credit, and that is the vice at which the underlying statutes forbidding wagering contracts; General Statutes §§ 52-553 and 52-554; are particularly directed. *King International Corporation* v. *Voloshin,* 33 Conn. Sup. 166, 169–71, 366 A.2d 1172 (1976).

In effect, the plaintiff urges that these judicial and legislative developments should lead us to reconsider *Ciampittiello* v. *Campitello,* supra, 56–57, in which we held that our prohibition against gambling was so deeply rooted in our public policy that we would not enforce a gambling contract despite its validity in Rhode Island, where the debt had been incurred. We decided *Ciampittiello* in accordance with the then prevalent analysis of the Restatement (First), Conflict of Laws § 612 (1934); Goodrich, Conflict of Laws (2d Ed. 1938) § 103; and 6 Williston, Contracts (Rev. Ed. 1938) § 1792, that required deference to the law of a contract's making unless the contrary law of the forum invoked "some prevalent conception of good morals, some deep-rooted tradition of the common weal." *Loucks* v. *Standard Oil Co.,* 224 N.Y. 99, 111, 120 N.E. 198 (1918) (Cardozo, J.). We recognize that there is now scholarly support for a different form of analysis. According to the Restate-

ment (Second), Conflict of Laws § 202 (1) (1971),[4] the effect of illegality is to be determined by the law of the state that has, in accordance with the standards of the Restatement (Second), Conflict of Laws § 188,[5] the most significant relationship to the parties and to the transaction. Compare General Statutes § 42a-1-105 (1); see also Weintraub, Commentary on the Conflict of Laws, c. 7 (1971). If that analytic model were adopted, the public policy of the forum state would no longer be dispositive. We note also that some courts in other jurisdictions have re-examined their positions in similar cases to allow out-of-state gambling debts to be enforced. See *Caribe Hilton Hotel* v. *Toland*, 63 N.J. 301, 303, 307 A.2d 85 (1973); *Intercontinental Hotels Corporation* v. *Golden*, 15 N.Y.2d 9, 14-17, 203 N.E.2d 210, 254 N.Y.S.2d 527 (1964); cf.

---

[4] Restatement (Second), Conflict of Laws § 202 (1) (1971) provides: "The effect of illegality upon a contract is determined by the law selected by application of the rules of §§ 187–188."

[5] Restatement (Second), Conflict of Laws § 188 provides:
"Law Governing in Absence of Effective Choice by the Parties

"(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

"(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a) the place of contracting,
    (b) the place of negotiation of the contract,
    (c) the place of performance,
    (d) the location of the subject matter of the contract, and
    (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

"These contracts are to be evaluated according to their relative importance with respect to the particular issue.

"(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203."

*McMahon* v. *Caribbean Mills, Inc.,* 332 F.2d 641, 645 (10th Cir. 1964). But see *Condado Aruba Caribbean Hotel, N.V.* v. *Tickel,* 39 Colo. App. 51, 53, 561 P.2d 23 (1977); *Gulf Collateral, Inc.* v. *Morgan,* 415 F. Sup. 319, 322 (S.D. Ga. 1976).

The present record provides no occasion for a searching reappraisal of *Ciampittiello.* Because of the parties' decision to move for summary judgment, we lack a factual basis for application of the criteria that the Restatement (Second), Conflict of Laws, would require us to apply, were we to adopt that analytic model. Nor are we prepared, on the present state of the evidence, to reconsider *Ciampittiello* were we to continue to follow the criteria of the Restatement (First). A case in which the plaintiff has failed to show that it lacked notice of the illegality of the questioned transactions under Connecticut law is, in any event, an unsuitable vehicle for farreaching exploration of public policy.[6] In short, the plaintiff has failed to demonstrate that the judgment of the trial court was in error.

There is no error.

In this opinion the other judges concurred.

---

[6] We note that in two of the cases enforcing gambling debts contracted in another jurisdiction, the courts found the regulatory apparatus in the foreign jurisdiction to be sufficiently rigorous to support enforcement of the suspect obligation in the forum state. See *Caribe Hilton Hotel* v. *Toland,* 63 N.J. 301, 303, 307 A.2d 85 (1973); *Intercontinental Hotels Corporation* v. *Golden,* 15 N.Y.2d 9, 15, 203 N.E.2d 210, 254 N.Y.S.2d 527 (1964). No such evidence has been proffered in the present proceedings. See Skolnick, The Dilemmas of Regulating Casino Gambling, 33 J. Soc. Sci. 129 (1979).