[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#113)
 FACTS
The plaintiff, the Mashantucket Pequot Gaming Enterprise, commenced this action on January 12, 1999 By filing a Complaint consisting of a single count. The complaint contains the following allegations. The plaintiff, a wholly owned subsidiary CT Page 4765 of the Mashantucket Pequot Tribe, runs the Foxwoods Resorts Casino. The defendant, Jo-Anne C. Kennedy, is the executrix of the estate of the decedent Robert F. Johnston. In 1992, the decedent obtained a line of credit from the plaintiff. On August 16, 1998, the decedent utilized the line of credit to borrow $60,000 from the plaintiff. The decedent issued to the plaintiff five checks totaling $60,000 as required by the compact between the Mashantucket Pequot tribe and the State of Connecticut. When the plaintiff later attempted to negotiate these checks, they were dishonored by the decedent's bank. The plaintiff seeks money damages.
On October 27, 1999, the defendant filed an amended answer and several special defenses. In her answer, the defendant denies that the decedent borrowed money from the plaintiff on August 16, 1998. As to the other material allegations of the complaint, she claims insufficient knowledge. In her second special defense, which is the only one relevant to the present motion, the defendant alleges that the decedent was a "high roller" who frequented the Foxwoods casino. She further alleges that if the plaintiff extended credit to the decedent, the plaintiff knew or should have known that the credit was to be used for gambling purposes. The defendant alleges that any lending agreement between the plaintiff and the decedent is therefore void under General Statutes § 52-553.
On November 2, 1999, the defendant filed a motion for summary judgment. The defendant argues that she is entitled to judgment as a matter of law because contracts for the extension of credit are void and unenforceable under General Statutes § 52-553. The defendant has submitted a memorandum of law in support of her motion for summary judgment and the plaintiff has submitted a memorandum in opposition.
 SUMMARY JUDGMENT STANDARD
The applicable standard on a motion for summary judgment is well established. "Practice Book § 17-49 provides that '[t]he judgment sought shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is whether a party would be entitled to a directed verdict on the same facts. ... Summary judgment in favor CT Page 4766 of the defendant is properly granted if the defendant in its motion raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact." (Citation omitted; internal quotation marks omitted.) Serrano v.Burns, 248 Conn. 419, 424, 727 A.2d 1276 (1999).
As the sole basis for her motion for summary judgment, the defendant argues that under Connecticut General Statutes §52-553, a contract to extend credit for gambling purposes is unenforceable. General Statutes § 52-553 provides, "All wagers, and all contracts and securities whereof the whole or any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void, provided nothing herein contained shall affect the validity of any negotiable instrument held by any person who acquired the same for value an in good faith without notice of illegality in the consideration."
The plaintiff responds that the extension of credit for gambling purposes is expressly provided for under the Tribal-state compact governing the operations of the casino. Appendix A of the Tribal-State compact contains explicit, detailed provisions governing extensions of credit. Appendix A, § 18 sets out the standards and procedures for the extension of credit. Appendix A, § 20 provides that when a dishonored check has been returned by the bank, as is alleged in the present case, "an attorney-at-law representing the Tribal operation may bring action for such collection." According to the plaintiff, this compact has the force of federal law and supercedes the statute upon which the defendant relies. Consideration of the parties' arguments necessitates a review of both the case law applying General Statutes § 52-553 and the legislative history of the federal law authorizing the Tribal-State compact.
 GENERAL STATUTES § 52-553
As the defendant points out, our courts have repeatedly held that General Statutes § 52-553 prohibits the enforcement of contracts for the repayment of money advanced for the purpose of gambling, even when the jurisdiction in which the contracts were made recognizes the validity of such contracts. In Ciampittiellov. Campitello, 134 Conn. 51, 54 A.2d 669 (1947), two brothers CT Page 4767 each contributed to a fund which they used for wagering at a race track in Rhode Island, where such gambling was legal. The brothers agreed that they would share equally in any winnings or losses. While returning from Rhode Island to Hartford with their winnings, the brothers were involved in an automobile accident; the brother who was in possession of the winnings was killed. The surviving brother claimed to be entitled to half of the winnings.
The trial court sustained the estate's demurrer to the surviving brother's claim. The Supreme Court, in affirming the trial court's conclusion, began by stating the general principle of our law that a plaintiff may enforce in the courts of this state any legal right of action which he may have, whether it arises under our own law or that of another jurisdiction. A well-established exception to this general rule is that we will not enforce the law of another jurisdiction or rights arising thereunder which contravene our public policy or violate our positive laws. Reilly v. Pepe Co., 108 Conn. 436, 445,143 A. 568." Ciampittiello v. Campitello, supra, 134 Conn. 54. The Court then reviewed the history of what is now General Statutes §52-553, as well as a criminal statute outlawing wagering on horse races. In conclusion, the court held that "our statutes express an ancient and deep-rooted public policy. It has been established and continued by the legislature, not by the courts. It follows that the judicial department of our government is being asked to enforce a claim which would be valid under the laws of another jurisdiction but which contravenes the ancient and deep-rooted public policy of this state. This it cannot do. Reilly v. Pepe,supra; Restatement, Conflict of Laws, § 612; 6 Williston, Contracts (Rev. Ed.) p. 5094." Ciampittiello v. Campitello, supra, 134 Conn. 56.
The lower courts of this state continued to follow the Supreme Court's reasoning during the decades following the Ciampittiello
case, despite the fact that the legislature legalized certain forms of gambling during the interim. In King International Corp.v. Voloshin, 33 Conn. Sup. 166, 366 A.2d 1172 (1976), the plaintiff was the owner and operator of a legally operated casino in Aruba, Netherlands Antilles, which sought to recover money advanced to the defendant in the form of gambling chips. Payment of the debt would have been enforceable under the laws of the Netherlands Antilles. The Superior Court acknowledged that the state of Connecticut had legalized certain forms of gambling, but nonetheless refused to enforce the contract, concluding that "the legalization of gambling in a limited and regulated manner, while constituting a change to some degree in this state's ancient and CT Page 4768 deep-rooted public policy prohibiting gambling, has had no effect on the long-established policy of this state condemning gambling on credit and prohibiting the enforcement of any claimed obligation relating thereto." Id., 171. See also Hilton of SanJuan. Inc. v. Lateano, 6 Conn. Cir. Ct. 680, 305 A.2d 538 (1972).
The issue was again before the Supreme Court in Casanova Clubv. Bisharat, 189 Conn. 591, 458 A.2d 1 (1983), a case with facts similar to the present controversy. The plaintiff was a casino operating legally in England. The defendant signed a series of checks in exchange for which he received gambling chips. The defendant's bank subsequently dishonored the checks because of insufficient funds. The plaintiff urged the Supreme Court to reconsider the public policy analysis of the Ciampittiello case.
The Court stated, "We decided Ciampittiello in accordance with the then prevalent analysis of the Restatement (First), Conflict of Laws § 612 (1934); Goodrich, Conflict of Laws (2d Ed. 1938) § 103; and 6 Willison, Contracts (Rev. Ed. 1983) § 1792, that required deference to the law of a contract's making unless the contrary law of the forum invoked 'some prevalent conception of good morals, some deep-rooted tradition of the common weal.' Loucks v. Standard Oil Co., 224 N.Y. 99, 111,120 N.E. 198 (1918) (Cardozo, J.). We recognize that there is now scholarly support for a different form of analysis. According to the Restatement (Second), Conflict of Laws § 202(1) (1971), the effect of illegality is to be determined by the law of the state that has, in accordance with the standards of the Restatement (Second), Conflict of Laws § 188, the most significant relationship to the parties and to the transaction. . . . If that analytic model were adopted, the public policy of the forum state would no longer be dispositive. We note also that some courts in other jurisdictions have re-examined their positions in similar cases to allow out-of-state gambling debts to be enforced." (Citation omitted.) Casanova Clubv. Bisharat, supra, 189 Conn. 598-99.
The court refused to reconsider the standard set forth in theCiampittiello case because the record provided an insufficient basis for such an evaluation: "The present record provides no occasion for a searching reappraisal of Ciampittiello. Because of the parties' decision to move for summary judgment, we lack a factual basis for application of the criteria that the Restatement (Second), Conflict of Laws, would require us to apply, were we to adopt that analytic model. Nor are we prepared, on the present state of the evidence, to reconsider Ciampittiello
CT Page 4769 were we to continue to follow the criteria of the Restatement (First). . . . In short, the plaintiff has failed to demonstrate that the judgment of the trial court was in error." Casanova Clubv. Bisharat, supra, 189 Conn. 600.
The defendant argues that this line of cases is controlling as to this case. In her memorandum in support of her motion for summary judgment she states that the "plaintiff is seeking to enforce a gambling debt in Connecticut's courts. The CasanovaClub case is, therefore, controlling, and as § 52-553 remains good law, it would violate Connecticut's clearly enunciated public policy to allow Plaintiff's action to proceed."[1] This argument assumes that a conflict between the Tribal-State compact and our General Statutes is to be resolved by the conflict-of-laws rules discussed in Ciampittiello and CasanovaClub.
There is an important distinction, however, between the cases cited by the defendant and the present controversy. While in the previous cases the question was whether the court would refuse to apply another state's law due to Connecticut's public policy, in the present case the court must decide whether it may refuse to apply the provisions of the Tribal-state compact which was negotiated by the State of Connecticut and the Mashantucket Pequot tribe and accepted by the federal Bureau of Indian Affairs. See Notice of Final Mashantucket Pequot Gaming Procedures, 56 Fed. Reg. 24,996 (1991). The present conflict, therefore, is between state and federa law and must be resolved according to the principles of federal preemption under the Supremacy Clause of the United States Constitution.[2]
"The authority of the United States Government is supreme in its cognizance of all subjects which the Constitution has committed to it. Consequently, there can be no conflict of authority between a state and the United States in respect to such a matter, the former being always subordinated and the latter paramount." 16 Am.Jur.2d, Conflict of Laws § 22 (1998). As the United States Supreme Court has stated, "The suggestion that the act of Congress is not in harmony with the policy of the State, and therefore that the courts of the State are free to decline jurisdiction, is quite inadmissible because it presupposes what in legal contemplation does not exist. When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for all the people and all the States, and thereby established a policy for all. That policy is as much the policy of [the State] as if the act had CT Page 4770 emanated from its own legislature, and should be respected accordingly in the courts of the State." (Internal quotation marks omitted.) Howlett v. Rose, 496 U.S. 356, 371-72,110 S.Ct. 2430, 110 L.Ed.2d 332 (1990).
The question presented, therefore, is whether application of General Statutes § 52-553 is prohibited by the operation of federal law. "In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law.., or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." (Citations omitted; internal quotations marks omitted.) Cipollonev. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608,120 L.Ed.2d 407 (1992). As a general matter, there is a presumption against federal preemption. See CSX Transportation. Inc . v.Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387
(1993). Laws affecting Indian tribes, however, are construed more liberally in favor of Tribal sovereignty. "The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of preemption that have emerged in other areas of the law. . .. Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence. . . . We have thus rejected the proposition that in order to find a particular state law to have been preempted by operation of federal law, an express congressional statement to that effect is required." (Citations omitted.) White MountainApache Tribe v. Bracker, 448 U.S. 136, 143-44, 100 S.Ct. 2578,65 L.Ed.2d 665 (1980). See also Bryan v. Itasca County, Minnesota,426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) ("[S]tatutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.")
"[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." (Internal quotations marks omitted.)Cipollone v. Liggett Group, Inc., supra, 505 U.S. 516. Whether the provisions of the Tribal-state compact preempt our state law against the extension of credit for gambling is therefore a question of Congress's intent. This intent may be ascertained by reviewing the legislative history of the Indian Gaming Regulatory Act (IGRA).
 THE IGRA AND THE TRIBAL-STATE COMPACT
CT Page 4771
Congress passed the IGRA in 1988 in order "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments... ." 25 U.S.C.A. § 2702(1) (Supp. 1999). The IGRA classifies gaming activities into three classes. Class I gaming "means social games solely for prizes of minimal value or traditional forms of Indian gaming. . . ."25 U.S.C.A. § 2703(6) (Supp. 1999). Class II gaming consists primarily of bingo and its variants. 25 U.S.C.A. § 2703(7) (Supp. 1999). Class III gaming "means all forms of gaming that are not class I gaming or class II gaming."25 U.S.C.A. § 2703(8) (Supp. 1999).
Under the IGRA, several prerequisites must be satisfied before Class III gaming is permitted on Indian lands. There must be a tribal ordinance or resolution, and the gaming activities must be "located in a State that permits such gaming for any purpose by any person organization, or entity, and ... conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State... ." 25 U.S.C.A. § 2710(d)(1). Tribal-State compacts are negotiated under detailed rules contained in the IGRA and "class III gaming on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact... ."25 U.S.C.A. § 2710(d)(2)(C) (Supp. 1999).
It was pursuant to these provisions that the Tribal-state compact at issue in the present case was adopted. "The courts inMashantucket Pequot Tribe v. State of Connecticut, 737 F. Sup. 169
(D. Conn. 1990); affirmed, 913 F.2d 1024 (2d Cir. 1990), required the Mashantucket Pequot Tribe and the State of Connecticut to enter into negotiations for a Class III gaming compact. This was to be accomplished under the remedial provisions established in the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2710(d)(7)(B). The Tribe and State negotiated but did not conclude a compact. After 60 days, each party submitted its best, last proposal to a mediator. The mediator was charged with choosing a compact which best comports with the IGRA. The Tribe advised the mediator that it accepted the State's proposal. Subsequently, the mediator chose the State's proposal. The State, however, declined to accept the mediator's chosen proposal." Notice of opportunity to comment on Mashantucket Pequot Gaming Procedures, 56 Fed. Reg. 15,746 (1991).
"Because the State failed to consent to the mediator's chosen CT Page 4772 compact, the Secretary of the Interior [was] required to prescribe procedures, in consultation with the Mashantucket Pequot Tribe, "under which class III gaming may be conducted.' on the Tribe's Indian lands. 25 U.S.C. § 2710(d)(7)(B)(vii)."56 Fed. Reg. 15,746. The Secretary concluded "that the State proposed compact is sufficient as a proper set of procedures for the Tribe's gaming. It is a 291 page comprehensive document which establishes the regulatory framework for a broad spectrum of activities." Id. Following the submission of comments, the Tribal-State compact was adopted by the Secretary of Interior with only minor amendment. Notice of Final Mashantucket Pequot Gaming Procedures, 56 Fed. Reg. 24, 996-98 (1991). In the notice adopting the compact, the Secretary rejected the State of Connecticut's argument that extensions of credit were not intended under the compact: "The State asserts that the Tribe and State did not intend to permit the extension of credit for gambling. However, the explicit provisions in appendix A covering the extension of credit indicate the State and Tribe's understanding that credit would be extended." Id., 24,997.
The legislative history of the IGRA reveals that Congress intended the Tribal-State compact to be the exclusive means for states to exercise regulatory control and jurisdiction, over gaming activities on Indian lands. The Indian Affairs Committee stated that the IGRA "is intended to expressly preempt the field in the governance of gaming activities on Indian lands." S. REP. NO. 100-446, 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076. "After lengthy negotiations and discussions, the Committee concluded that the use of compacts between tribes and states is the best mechanism I to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises such as pari-mutuel horse and dog racing, casino gaming, jai alai and so forth. The Committee notes the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply. The Committee balanced these concerns against the strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands. The Committee concluded that the compact process is a viable mechanism for setting various matters between two equal sovereigns." Id., 13, 1988 U.S.C.C.A.N. 3083. "[T]he Committee has developed a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of itssovereign rights, unless a tribe affirmatively elects to haveState laws and State jurisdiction extend to tribal lands, theCT Page 4773Congress will not unilaterally impose or allow State jurisdictionon Indian lands for the regulation of Indian gaming activities." (Emphasis added.) Id., 5-6, 1988 U.S.C.C.A.N. 3075.
The conclusion that the Tribal-state compact provided for under the IGRA was intended to be the exclusive means for extension, of state control to gaming on Indian lands is further supported by the Indian Affairs Committee's stated intention to have the IGRA modify federal case law: "While some States have attempted to assert jurisdiction over tribal bingo games, tribes have very strenuously resisted these attempts. It was this conflict which gave rise to the California v. Cabazon Band of Mission Indianscase ... decided by the Supreme Court on February 25, 1987. (480 U.S. 202, 94 L.Ed.2d 244, 1987). . . . In deciding the Cabazon
case, the Supreme Court used a balancing test, weighing the interests of States, tribes and the Federal Government.... However, in the final analysis, it is the responsibility of the Congress, consistent with its plenary power over Indian affairs, to balance competing policy interests and to adjust, where appropriate, the jurisdictional framework for regulation of gaming on Indian lands. ... For class III casino, parimutuel and slot machine gaming, the bill authorizes tribal governments and State governments to enter into tribal-State compacts to address regulatory and jurisdictional issues." S. REP. NO. 100-446, 2-3, 1988 U.S.C.C.A.N. 3071-73. The IGRA reflects, therefore, Congress's intention that conflicting policy interests be resolved through the process of negotiating the Tribal-state compact, rather than in the courtroom, as had previously been done.
It naturally follows from this, and from the preemption doctrine discussed above, that once a tribal-State compact is in effect, its terms are binding on the State. As one federal Court of Appeals has stated, "Congress, in passing IGRA, did not create a mechanism whereby states can make empty promises to Indian tribes during goodfaith negotiations of Tribal-State compacts, knowing that they may repudiate them with immunity whenever it serves their purpose." Cabazon Band of Mission Indians v. Wilson,124 F.3d 1050, 1056 (9th Cir. 1997), cert. denied, 524 U.S. 926,118 S.Ct. 2319, 141 L.Ed.2d 694 (1998). Consequently, this court may not refuse to enforce the provisions of the compact on the ground that they are in conflict with General Statutes §52-553.
 CONCLUSION
CT Page 4774
For the foregoing reasons, the provisions of the Tribal-state compact are controlling as to matters relating to gaming on Mashantucket Pequot lands, and this court may not apply General Statutes § 52-553 to the extent that it conflicts with the compact. The defendant's motion for summary judgment is premised entirely on the application of that statute. The motion in therefore denied.
D. Michael Hurley, Judge Trial Referee