IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 35200

| STATE OF IDAHO, by and through LAWRENCE G. WASDEN, Attorney General, | ) ) ) ) | |
|---|---|---|
| Plaintiff-Respondent, | ) ) ) | Boise, November 2009 Term |
| v. | ) ) | 2010 Opinion No. 2 |
| SCOTT B. MAYBEE, d/b/a SMART-SMOKER.COM, BUYCHEAP-CIGARETTES.COM and ORDER-SMOKESDIRECT.COM, | ) ) ) ) ) | Filed: January 15, 2010

Stephen W. Kenyon, Clerk |
| Defendant-Appellant. | ) ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Kathryn A. Sticklen, District Judge.

District court order granting summary judgment for State in case involving unstamped cigarettes sold in interstate commerce, affirmed.

Stoel Rives, LLP, Boise, for appellant. J. Walter Sinclair argued. Margaret Murphy, Buffalo, New York, argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Brett T. DeLange argued.

---

BURDICK, Justice

Scott B. Maybee challenges the district court's grant of summary judgment in favor of the State of Idaho. Maybee argues that Idaho's Tobacco Master Settlement Agreement Complementary Act (Complementary Act) is inapplicable to his conduct, as the Complementary Act was not intended to regulate unstamped cigarettes sold in interstate commerce. Maybee also contends that the Complementary Act is preempted as it applies to him, under both the Interstate Commerce Clause and the Indian Commerce Clause of the U.S. Constitution, as Maybee is a Native American, living and conducting business upon a reservation located in the state of New York. Maybee argues that the tobacco permit requirement of Idaho's Prevention of Minors' Access to Tobacco Act (MAA) is likewise preempted by the Indian Commerce Clause.

1

# I. STATUTORY BACKGROUND

On November 23, 1998, the four largest tobacco product manufacturers in the United States entered into the Master Settlement Agreement (MSA) with 46 states, including Idaho. The MSA arose out of litigation between the states and tobacco companies concerning responsibility for the costs associated with the treatment of tobacco-related health conditions. *See* MSA (November 23, 1998), http://www2.idaho.gov/ag/consumer/tobacco/MSA.pdf. In addition to requiring changes in advertising and marketing practices the MSA "obligates these manufacturers, in return for a release of past, present and certain future claims against them . . . to pay substantial sums to the state (tied in part to their volume of sales.)" I.C. § 39-7801(e). Under the terms of the MSA, each participating state is required to enact and enforce a "qualifying statute" that "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers[1] experience vis-à-vis Non-Participating Manufacturers within such Settling State as a result of the provisions of [the MSA]." MSA at 52; *see* I.C. § 39-7801(f). If Participating Manufacturers can prove that their market share in a given state has decreased as a result of the MSA, and that the state has not diligently enforced its "qualifying statute," then Participating Manufacturers are entitled to a Non-Participating Manufacturer Adjustment (NPM Adjustment). MSA at 47-59. An NPM Adjustment is a reduction in scheduled payments under the MSA, and results in states having fewer funds available to cover medical costs incurred as a result of tobacco-related health issues. *See id.*

In an attempt to comply with the MSA's requirements, Idaho passed the Master Settlement Agreement Act (MSAA), codified at I.C. §§ 39-7801 to 7803. The MSAA requires tobacco manufacturers to either: (1) join the MSA as signatories, whereupon they will be required to make payments to the State in accordance with the MSA schedule, or (2) make payments into a qualified escrow account in accordance with I.C. § 39-7803(b)(1). Following passage of the MSAA, the Idaho Legislature determined that cigarettes produced by Non-Participating Manufacturers were being sold in Idaho, without qualified escrow payments being made, and that additional measures were necessary to ensure compliance with the MSAA. As a result, the Complementary Act was passed in 2003.

---

[1] As used throughout this opinion, "Participating Manufacturer(s)" refers to those tobacco product manufacturers who have bound themselves to comply with the MSA, either as original signatories or as subsequent adopters.

In the findings and purpose of the Complementary Act, I.C. § 39-8401, the legislature determined that:

[V]iolations of Idaho's tobacco master settlement agreement act threaten the integrity of Idaho's master settlement agreement with leading tobacco product manufacturers, the fiscal soundness of the state, and the public health. The legislature finds that enacting procedural enhancements will help prevent violations of Idaho's tobacco master settlement agreement act and thereby safeguard the master settlement agreement, the fiscal soundness of the state and the public health.

As such, the goal of the Complementary Act was to prevent end-runs around the fee requirements of the MSA and the escrow requirement of the MSAA, through the sale of cigarettes produced by Non-Participating Manufacturers, who were not paying fees in accordance with the MSA, and were not making escrow payments in accordance with the MSAA. The State was seeking to protect the scheduled fee payments under the MSA, and ensure that appropriate escrow funds are available to the State when needed to pay for medical expenses incurred due to tobacco-related health conditions, thereby protecting the public health.

Pursuant to this goal, I.C. § 39-8403(1) requires all tobacco product manufacturers whose products are sold in Idaho to provide Idaho's attorney general with an annual certification that the manufacturer is either a signatory to the MSA or is fully complying with the escrow requirements of the MSAA. Idaho Code § 39-8403(2) directs the Idaho attorney general to develop and publish the Directory of Compliant Tobacco Product Manufacturers and Brand Families (Idaho Directory), listing all tobacco product manufacturers who have met their obligations under I.C. § 39-8403(1) of the Complementary Act.[2] *See* Idaho Directory (October 5, 2009), http://www2.state.id.us/ag/consumer/tobacco/manufacturer_directory.htm. Idaho Code § 39-8403(3) makes it unlawful for any person:

(b) To sell, offer or possess for sale in this state, cigarettes of a tobacco product manufacturer or brand family not included in the directory; (c) To acquire, hold, own, possess, transport, import, or cause to be imported cigarettes that the person knows or should know are intended for distribution or sale in the state in violation of this subsection (3).

---

"Non-Participating Manufacturer(s)" refers to those tobacco product manufacturers who are not signatories, nor adopters of the MSA.

[2] As used throughout this opinion, "Noncompliant Manufacturer(s)" refers to those Non-Participating Manufacturers who have not met their escrow obligations under the MSAA, and therefore are not included on Idaho's Directory of Compliant Tobacco Product Manufacturers and Brand Families. "Noncompliant Cigarettes" refers to cigarettes produced by Noncompliant Manufacturers.

3

Idaho has been particularly concerned with the influence and effects of tobacco products on children and young adults, and in an effort to help prevent future tobacco-related health conditions, the legislature passed the MAA in 1998. I.C. § 39-5701 *et seq*. In the legislative findings and intent of the MAA the legislature noted that decreasing tobacco use amongst Idaho's minors (estimated at that time to be at least 27%) was a State goal, related to the promotion of the general health and welfare. I.C. § 39-5701. The legislature further found tobacco to be a "gateway drug," with children who use tobacco being far more likely to use other illegal substances, including alcohol, marijuana, and cocaine. *Id*. Finally, the legislature determined that:

> Tobacco is the number one killer in Idaho causing more deaths by far than alcohol, illegal drugs, car crashes, homicides, suicides, fires and AIDS combined. According to the center for disease control and prevention (CDC), twenty-four thousand three hundred ninety-four (24,394) children in Idaho currently under eighteen (18) years of age will die prematurely from tobacco-related disease. Tobacco costs the state over two hundred forty million dollars ($240,000,000) each year and is the single most preventable cause of death and disability in Idaho.

*Id*. The legislature passed the MAA in an effort to prevent minors from accessing tobacco products, in part by regulating who is authorized to sell tobacco. Idaho Code § 39-5704(1) states that it "shall be unlawful to sell or distribute or offer tobacco products for sale or distribution at retail or to possess tobacco products with the intention of selling at retail without having first obtained a tobacco permit from the department which shall be the only retail tobacco permit or license required."

Once again, after several years the legislature determined that the MAA was not entirely effective in accomplishing its goal, and additional measures were required to shore up the act. In 2003, the MAA was amended, with minor changes to I.C. §§ 39-5702 and 5710, and the addition of I.C. §§ 39-5714 to 5718. The statement of purpose accompanying the house bill that was later passed as the 2003 amendment, states:

> Over the past several years, the State of Idaho has been a leader in preventing youth access to tobacco products. With the rise of tobacco sales via the internet and other direct sales means, a hole in existing Idaho law has surfaced. This legislation would stop a delivery sale of tobacco products to any individual who is under the legal minimum purchase age in Idaho.

H.B. 357, RS 13148, 57th Leg., Reg. Sess. (Idaho 2003), *available at* http://www3.state.id.us/oas

4

is/2003/H0357.html#sop. The pertinent changes brought about by the 2003 amendment are as follows: I.C. § 39-5718 requires all delivery sellers to obtain a tobacco permit, and to provide the State with regular information regarding all delivery sales; I.C. § 39-5714 forbids tobacco permit holders from making delivery sales to minors; I.C. § 39-5716 requires delivery sellers to include specific language concerning health risks and taxes on all advertisements or websites; and I.C. § 39-5717 requires that each delivery sales order include a document with the following language: "TOBACCO PRODUCTS: IDAHO LAW PROHIBITS SHIPPING TO INDIVIDUALS UNDER THE AGE OF EIGHTEEN YEARS, AND REQUIRES THE PAYMENT OF TAXES PURSUANT TO CHAPTER 25, TITLE 63, IDAHO CODE. PERSONS VIOLATING THIS MAY BE CIVILLY AND CRIMINALLY LIABLE."

## II. FACTUAL AND PROCEDURAL BACKGROUND

Maybee is a Native American member of the Seneca Nation of Indians and resides on an Indian reservation located in western New York. As the sole proprietor of the websites smartsmoker.com, ordersmokesdirect.com, and buycheapcigarettes.com, Maybee has sold over 2,500,000 cigarettes from brands not listed on the Idaho Directory to consumers located within Idaho. Maybee does not possess an Idaho tobacco permit.

On August 21, 2006, an Idaho deputy attorney general wrote a letter to Maybee, advising Maybee of Idaho's tobacco laws and Maybee's apparent violation of those laws, and requesting that Maybee desist in his unlawful conduct. On September 22, 2006, the State filed a Verified Complaint against Maybee with the district court, alleging violations of the Complementary Act and the MAA. Maybee failed to respond to the Complaint and the State obtained a Default Judgment on November 12, 2006. Pursuant to a motion filed by Maybee, the district court set aside the default judgment on January 19, 2007.

On June 19, 2007, the State moved for summary judgment, and on August 21, 2007, Maybee made a cross-motion for summary judgment. A summary judgment hearing was held before the district court on September 18, 2007, and on October 31, 2007, the district court issued its Memorandum Decision and Order finding that the State was entitled to summary judgment.

First, the district court held that the cigarette sales in question took place in Idaho for purposes of the Complementary Act. The court then found that Maybee was judicially estopped from claiming that the sales took place in New York, as Maybee had previously submitted an

5

affidavit in a New York case representing that his internet sales took place in the purchasers' home states. The court also noted that the Idaho Uniform Commercial Code (IUCC) was likely inapplicable to the Complementary Act, as far as determining where the cigarette sales took place. Second, the court held that Maybee's arguments concerning preemption under the Indian Traders Act was clearly misplaced as the Act clearly regulated only sales *to* Native Americans, not sales *from* Native Americans. Third, the court found that the Indian Commerce Clause did not preempt application of the MAA to Maybee (this ruling was possibly extended to the Complementary Act as well. On this point the Memorandum Decision and Order is unclear). Fourth, the court found that the Complementary Act, as applied to Maybee, was not preempted by the Interstate Commerce Clause.

Maybee filed a Motion for Reconsideration on December 17, 2007, based in part upon his "corrected" affidavit in the New York case that had been relied upon by the district court in finding Maybee judicially estopped from claiming that his sales occurred in New York and not Idaho. On February 26, 2008, the district court issued its second Memorandum Decision and Order denying Maybee's motion on the grounds that amending the affidavit from the New York case did not change the finding of judicial estoppel, and reiterating that, in the alternative, the IUCC was not controlling on the issue of situs of sales for purposes of the Complementary Act. Also on February 26, 2008, the district court entered a Judgment, enjoining Maybee from selling cigarettes not listed on the Idaho Directory to parties within Idaho, or importing Noncompliant Cigarettes into the state of Idaho. The Judgment further enjoined Maybee from selling any tobacco products in Idaho, or possessing them for retail in Idaho, without first obtaining the tobacco permit mandated by the MAA. Finally, the district court awarded the State civil penalties of $163,225, as well as costs and attorney fees pursuant to I.C. § 39-8407(5).

On April 8, 2008, Maybee filed his Notice of Appeal to this Court. We now affirm.

### III. STANDARD OF REVIEW

"On appeal from the grant of a motion for summary judgment, this Court's standard of review is the same as the standard used by the district court originally ruling on the motion." *Boise Tower Assoc., LLC v. Hogland,* 147 Idaho 774, __, 215 P.3d 494, 499 (2009). Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). If the evidence presented

6

shows no disputed issues of material fact, then all that remains are questions of law, over which this Court exercises free review. *Mendenhall v. Aldous*, 146 Idaho 434, 436, 196 P.3d 352, 354 (2008). "The Supreme Court exercises free review over issues of statutory interpretation." *Taylor v. Maile*, 146 Idaho 705, 711, 201 P.3d 1282, 1288 (2009).

## IV. ANALYSIS

The facts are not in dispute, having been stipulated to by the parties. This Court must determine four issues. First, whether the Complementary Act is intended to regulate interstate sales, and whether Maybee sells cigarettes or offers cigarettes for sale within Idaho. Second, whether the Complementary Act, as applied to interstate delivery sellers, is preempted by the Interstate Commerce Clause. Third, whether the Complementary Act and the MAA, as applied to Maybee, are preempted by the Indian Commerce Clause. Fourth, whether the State is entitled to attorney fees on appeal. We shall address these issues in turn.

**A. The Complementary Act is intended to govern interstate as well as intrastate sales of cigarettes to consumers in the state of Idaho, and Maybee sells cigarettes in Idaho.**

The goal of the Idaho Legislature in enacting the Complementary Act was to prevent the sale of cigarettes made by any Noncompliant Manufacturer. Maybee, as a matter of uncontested fact, has sold over 2,500,000 cigarettes (as defined under the MSAA and Complementary Act) produced by Noncompliant Manufacturers to Idaho consumers.

1. The Complementary Act regulates cigarettes, as defined by the MSAA, not merely "units sold."

Maybee acknowledges that he has sold unstamped cigarettes, not listed on the Idaho Directory, through interstate commerce, to Idaho consumers. Nevertheless, Maybee contends that he is not subject to the Complementary Act's restrictions, as the Complementary Act and the MSAA must be interpreted *in pari materia*, and therefore those Acts regulate not "cigarettes" but "units sold." Maybee cites to the statement of purpose for House Bill 111, which later became the Complementary Act. That statement of purpose reads:

> This proposed legislation is designed to be complementary legislation to Idaho's Tobacco Master Settlement Agreement Act ("the Act"). Under Idaho's Master Settlement Agreement with the tobacco industry, Idaho must diligently enforce the Act. A number of tobacco product manufacturers are not complying with the provisions of the Act. Many of the non-compliant manufacturers are located in foreign countries. Effecting compliance is in some cases quite difficult because of their location. Requiring cigarette distributors to only stamp and distribute cigarettes of tobacco product manufacturers that are in compliance with the Act, and establishing procedures and remedies to ensure that the Act's provisions will

7

be followed will significantly improve compliance under, and assist Idaho with its duty of enforcing, the Act.

H.B. 111, RS 12609, 57th Leg., Reg. Sess. (Idaho 2003), *available at* http://www3.state.id.us/oas is/2003/H0111.html. Maybee argues that, because the MSAA only requires Non-Participating Manufacturers to make escrow payments for "units sold," (such definition not including cigarettes that do not bear an Idaho tax stamp) the Complementary Act should also be read as regulating "units sold" rather than all cigarettes. Maybee contends that the regulation of "units sold" is all that is required for the State to meet its obligations of diligently enforcing the MSAA, as required by the MSA, and that therefore the State is not at risk of an NPM Adjustment under the MSA.

The basic rules of statutory construction were summarized by this Court in *City of Sandpoint v. Sandpoint Independent Highway District*:

> The interpretation of a statute is a question of law over which we exercise free review. It must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written. A statute is ambiguous where the language is capable of more than one reasonable construction. If the statute is ambiguous, then it must be construed to mean what the legislature intended for it to mean. To determine that intent, we examine not only the literal words of the statute, but also the reasonableness of proposed constructions, the public policy behind the statute, and its legislative history. Statu[t]es that are *in pari materia* must be construed together to effect legislative intent. Statutes are *in pari materia* if they relate to the same subject.

139 Idaho 65, 69, 72 P.3d 905, 909 (2003) (internal citations omitted). "Language of a particular section need not be viewed in a vacuum. And all sections of applicable statutes must be construed together so as to determine the legislature's intent." *Friends of Farm to Market v. Valley County*, 137 Idaho 192, 197, 46 P.3d 9, 14 (2002) (internal quotation marks omitted) (quoting *Lockhart v. Dept. of Fish and Game*, 121 Idaho 894, 897, 828 P.3d 1299, 1302 (1992)). "Constructions that would lead to absurd or unreasonably harsh results are disfavored." *In re Daniel W.*, 145 Idaho 677, 680, 183 P.3d 765, 768 (2008).

The words of the Complementary Act, given their plain, usual and ordinary meaning, are unambiguous, and are not in conflict with any provision of the MSAA. Idaho Code § 39-8402(2) provides that "cigarette" has the same meaning under the Complementary Act as it has under the

MSAA, defined at I.C. § 39-7802(d).[3]  The definition of cigarette makes no reference to tax stamps, or units sold, and is quite broad in scope.  Having incorporated this definition, I.C. § 39-8403(3) states:

> It shall be unlawful for any person: (a) To affix a stamp to a package or other container of cigarettes of a tobacco product manufacturer or brand family not included in the directory; (b) To sell, offer or possess for sale in this state, cigarettes of a tobacco product manufacturer or brand family not included in the directory; (c) To acquire, hold, own, possess, transport, import, or cause to be imported cigarettes that the person knows or should know are intended for distribution or sale in the state in violation of this subsection (3).

The plain meaning of this statute is, *inter alia*, that it is illegal to sell, offer, or possess for sale Noncompliant Cigarettes, within Idaho.

It is worth noting that under Maybee's proposed interpretation, an absurdity would result. Idaho Code § 39-8403(3)(a) mandates that no stamps be affixed to cigarettes manufactured by Noncompliant Manufacturers.  If we were to accept Maybee's proposed interpretation of "cigarettes" under the Complementary Act as meaning "units sold," then I.C. § 39-8403(3)(a) is mandating that one may not affix a tax stamp to a Noncompliant Cigarette, and since unstamped cigarettes are not considered cigarettes, this in-effect means that one may not affix a stamp to a stamped cigarette.

We hold that the Complementary Act clearly prohibits selling, or offering for sale, Noncompliant Cigarettes, in Idaho.

2.  The Complementary Act applies to interstate "delivery" sellers as well as to intrastate sellers.

Maybee next argues that the Complementary Act, read *in pari materia* with the MSAA, is applicable only to intrastate sales of cigarettes in Idaho.  In summary, this argument is as

---

[3] "Cigarette" means any product that contains nicotine, is intended to be burned or heated under ordinary conditions of use, and consists of or contains: (1) any roll of tobacco wrapped in paper or in any substance not containing tobacco; or (2) tobacco, in any form, that is functional in the product, which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette; or (3) any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette described in clause (1) of this definition. The term "cigarette" includes "roll-your-own" (i.e., any tobacco which, because of its appearance, type, packaging, or labeling is suitable for use and likely to be offered to, or purchased by, consumers as tobacco for making cigarettes). For purposes of this definition of "cigarette," nine one-hundredths (0.09) ounces of "roll-your-own" tobacco shall constitute one (1) individual "cigarette."
I.C. § 39-7802(d).

9

follows: (1) the State's sole purpose in enacting the Complementary Act was to prevent an NPM Adjustment in the scheduled payments to the State from the Participating Manufacturers under the MSA; (2) the State has no obligation to regulate the sale of unstamped cigarettes within Idaho under the MSAA (the qualifying statute enacted in accordance with the MSA), and so would not face an NPM Adjustment by allowing interstate sales of Noncompliant Cigarettes; (3) out-of-state delivery sellers have no substantial nexus to the state and therefore cannot be required to collect or remit taxes on goods sold in interstate commerce to Idaho consumers, as such, these sellers do not have to stamp their cigarettes; and (4) the State therefore had no intention of regulating the conduct of interstate sellers selling unstamped cigarettes in Idaho.

The logical flaws in this argument are apparent. First, as stated above, the plain language of the Complementary Act demonstrates a legislative intent to regulate the sale of all cigarettes, not only stamped cigarettes, whereas the MSAA regulates only stamped cigarettes ("units sold"). Second, under Maybee's proposed interpretation, Non-Participating Manufacturers based outside of Idaho could avoid their escrow obligations altogether by simply selling their cigarettes directly to Idaho consumers through the mail, or through an out-of-state retailer who would sell directly to Idaho consumers through the mail, rather than through in-state wholesalers and retailers. Such a result would violate not only the spirit of the MSA, but also Idaho public policy, and would be detrimental to the fiscal soundness of the State. Third, this argument glosses over the fact that, possible NPM Adjustments aside, Non-Participating Manufacturers that do not comply with the MSAA's escrow requirements deprive the State of financial assets, which are needed to defray medical care costs that have arisen as a result of tobacco-related health issues.

"Statutes are construed under the assumption that the legislature was aware of all other statutes and legal preceden[t] at the time the statute was passed." *Druffel v. State, Dep't of Transp.*, 136 Idaho 853, 856, 41 P.3d 739, 742 (2002).

### i. The Complementary Act & Idaho Code § 63-2508

The Complementary Act provides that it shall be unlawful for any person "[t]o affix a stamp to a package or other container of cigarettes of a tobacco product manufacturer or brand family not included in the directory." I.C. § 39-8403(3)(a). Idaho Code § 63-2508 provides that:

> No cigarettes may be purchased, sold, distributed, stored or held on hand or in possession of any person *without Idaho stamps having been affixed thereto*, within a reasonable time after receipt thereof. No person may import cigarettes,

nor hold or have in possession *unstamped cigarettes*, unless he shall have qualified under this act as a wholesaler and obtained a permit, as provided for in section 63-2503, Idaho Code.

(Emphasis added). Idaho Code § 63-2508 was enacted in 1974, and amended in 1986, long before the Complementary Act was enacted in 2003. *See* S.L. 1986, ch. 193, § 5. When the legislature forbade the stamping of Noncompliant Cigarettes in I.C. § 39-8403(a), they did so with the knowledge that I.C. § 63-2508 broadly restricts the legality of possessing unstamped cigarettes within the state.

### ii. The Complementary Act & the MAA

In 2003, the legislature amended the MAA, seeking to strengthen existing Idaho tobacco statutes, as they pertain to internet and delivery sellers. Under this amendment, Idaho Code § 39-5702(2) defines a "[d]elivery sale" as:

[T]o distribute tobacco products to a consumer in a state where either: (a) the individual submits the order for such sale by means of a telephonic or other method of voice transmission, data transfer via computer networks, including the internet and other online services, or facsimile, or the mails; or (b) the tobacco products are delivered by use of the mails or a delivery service.

From the stipulated and uncontested facts of this case, it is clear, as a matter of law, that Maybee is engaged in delivery sales. Idaho Code § 39-5714 addresses "[r]equirements for delivery sales," providing in I.C. § 39-5714(2):

Each permittee taking a delivery sale order shall comply with . . . *all other laws of the state of Idaho generally applicable to sales of tobacco products* that occur entirely within Idaho including, but not limited to, those laws imposing excise taxes, sales and use taxes, licensing and tax stamping requirements and escrow or other payment obligations.[4]

(Emphasis added). This is an unambiguous requirement that all delivery sellers shall be treated the same as in-state face-to-face sellers under the law. The plain language provides for no other reasonable interpretation.

3. The Idaho Uniform Commercial Code is not determinative of the situs of sales for purposes of application of the Complementary Act; Maybee sold Noncompliant Cigarettes in Idaho.

---

[4] Idaho Code § 39-5704 requires all persons to acquire a tobacco permit prior to selling tobacco, offering tobacco for sale, possessing tobacco with the intent to sell, or distributing tobacco at retail. So although I.C. § 39-5714(2) is phrased in terms of "permittees" this is because these delivery sales are flatly forbidden by those not holding permits. This Court will address the permit requirement in more detail later in this opinion.

11

Maybee next contends that he does not sell, or offer for sale, Noncompliant Cigarettes in Idaho. The provision of the Complementary Act that Maybee was sued under, I.C. § 39-8403(3)(b), prohibits anyone from selling, offering for sale, or possessing for sale in Idaho, Noncompliant Cigarettes. Maybee contends that the Uniform Commercial Code, as adopted by the Idaho Legislature, should be considered dispositive in determining where Maybee's sales take place for purposes of the Complementary Act. He also asserts that under the IUCC Maybee's sales take place in New York, and that therefore his conduct is not subject to regulation by the Complementary Act. The State responds that the official comment to I.C. § 28-2-401(2)(a) makes it clear that the IUCC's determination of the situs of sale, or transfer of title, is not controlling in determining whether a public regulation applies to a given transaction, and that Maybee is judicially estopped from arguing that his sales did not take place in Idaho.[5]

The relevant portion of the IUCC reads as follows:

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but (b) if the contract requires delivery at destination, title passes on tender there.

I.C. § 28-2-401(2). Section one of the Official Comments to I.C. § 28-2-401 states "[t]his section, however, in no way intends to indicate which line of interpretation should be followed in cases where the applicability of 'public' regulation depends upon a 'sale' or upon location of 'title' without further definition."

The goal of the legislature in enacting I.C. § 39-8403(3) of the Complementary Act was to prevent the cigarettes of Noncompliant Manufacturers from being sold to Idaho consumers. Idaho Code § 39-8403(3) is concerned with the introduction of Noncompliant Cigarettes into Idaho, not where the legal title to those cigarettes passes. Therefore, we hold that the Uniform Commercial Code is irrelevant to the determination of where Maybee's cigarette sales took

---

[5] "[T]he party asserting judicial estoppel must show that the sworn statement at issue was used to obtain a judgment, advantage, or consideration from another party." *Indian Springs LLC v. Indian Springs Land Inv., LLC*, 147 Idaho 737, __, 215 P.3d 457, 469 (2009). The State's judicial estoppel claim fails on appeal as they failed to meet this burden.

place, and that those cigarette sales did, in fact, take place in Idaho for purposes of the Complementary Act.

**B. The Interstate Commerce Clause of the United States Constitution does not preempt the Complementary Act as it applies to Maybee.**

The next argument put forth by Maybee is that if the Complementary Act is interpreted as regulating interstate, as well as intrastate, sales, it is in conflict with the Interstate Commerce Clause of the United States Constitution.

Article I, Section 8, clause 3 of the United States Constitution is the basis for what is commonly termed the Interstate Commerce Clause, granting Congress the power "[t]o regulate commerce . . . among the several states. . . ." In addition to providing Congress with the authority to regulate commerce between states, this clause has long been interpreted as implicitly containing a negative or dormant restraint, preempting state regulations that would interfere with the free-flow of interstate commerce, even where the state regulations do not conflict with existing federal regulation. *United Haulers, Ass'n*, *v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). There are three ways in which a state statute may be found to be in violation of the dormant Commerce Clause.

First, it may facially discriminate. As summarized by the United States Supreme Court in *United Haulers*, a state law is *per se* unconstitutional if "it discriminates on its face against interstate commerce. In this context, "'discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Id.* (internal citations omitted) (quoting *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Ore.,* 511 U.S. 93, 99 (1994)). Second, the burdens a statute places upon commerce may outweigh its local benefits. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Third, a statute may attempt to regulate conduct occurring entirely outside the state. In *Healy v. Beer Institute, Inc.*, the Supreme Court held that:

> First, the "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," *Edgar v. MITE Corp.,* 457 U.S. 624, 642-43 (1982) (plurality opinion). . . . Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent

13

limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State.

491 U.S. 324, 336 (1989).

The Complementary Act does not facially discriminate against interstate commerce. As is relevant here, it prohibits both intrastate and interstate parties from selling, or offering for sale, Noncompliant Cigarettes in Idaho. *See* I.C. § 39-8403(3). This regulation does not benefit in-state economic interests at the expense of out-of-state economic interests; all sellers are treated equally regardless of their location. The burdens upon interstate commerce do not outweigh the local benefits of the Complementary Act's regulation. As discussed above, the State's interest in regulating sales of Noncompliant Cigarettes is to ensure adequate funds to provide medical care for citizens who have developed tobacco-related health problems. This is unquestionably a legitimate public purpose, and any impact it has upon interstate commerce is plainly incidental. Finally, the commerce regulated here does not occur wholly outside the boundaries of the State; if it did the Complementary Act, as interpreted, would not apply.

In the case of *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2nd Cir. 2004), the Second Circuit Court of Appeals considered whether New York's so-called "Contraband Statutes" violated the dormant Commerce Clause. These Contraband Statutes are very similar to the provision of the Complementary Act at dispute here, and were passed in response to New York's signing of the MSA. *See id.* at 215. The Contraband Statutes forbid the tax-stamping of Noncompliant Cigarettes, and forbid the selling of unstamped cigarettes in New York. *Id.* The court in *Freedom Holdings* examined the three types of possible violations to the commerce clause and rejected them all. *Id.* at 216-22.

There is no evidence that Idaho's Complementary Act treats interstate sellers any differently from intrastate sellers, that the burdens on interstate commerce outweigh the local benefits, nor that the Act is attempting to regulate activities occurring entirely outside of Idaho. Therefore, we hold that the Complementary Act, as interpreted, is not preempted by the Interstate Commerce Clause.

**C. The Indian Commerce Clause of the United States Constitution does not preempt the Complementary Act and the MAA, as they apply to Maybee.**

Maybee next contends that the Complementary Act and the MAA, as applied to an on-reservation tribal member, are preempted by the Indian Commerce Clause of the United States

Constitution. The State argues that, as far as it concerns the Complementary Act, this argument should not be considered because it is raised for the first time on appeal. In the alternative, the State argues that neither the Complementary Act nor the MAA conflict with the Indian Commerce Clause.

### 1. Waiver

The State asserts that, in argument before the district court, "[Maybee] contended only that the Indian trader statutes, 25 U.S.C. § 261-265, preempted the Complementary Act. . . . His vacillating preemption theories procedurally default his preemption claim as to the Complementary Act."

"An issue raised for the first time on appeal will not be considered by this Court." *Cristo Viene Pentecostal Church v. Paz,* 144 Idaho 304, 310, 160 P.3d 743, 749 (2007). However, where one party presents an issue to the trial court, it is addressed by the trial court, and it is raised and fully briefed on appeal, the issue may properly be heard by this Court. *Northcutt v. Sun Valley Co.*, 117 Idaho 351, 357, 787 P.2d 1159, 1165 (1990).

The transcript of the summary judgment hearing held before the district court on September 18, 2007, reveals that the State argued this issue before the district court:

> Defendant has raised two Indian law arguments that I want to quickly respond to with *respect to the Complementary Act*. One of them is that the Indian Commerce Clause prohibits this. And that's just not true. The U.S. Supreme Court has said there's no dormant sort of provision to the Indian Commerce Clause. It's just an authority for the congress to enact legislation.

In the district court's first Memorandum Decision and Order, the court ruled on the applicability of the Indian Commerce Clause as follows: "The Indian Commerce Clause, Article 1, § 8 of the United States Constitution, and the Indian Traders Act, 25 U.S.C. § 261, do not support Maybee's position here." It is unclear whether the court was addressing the Indian Commerce Clause in respect to only the MAA or to both the MAA and the Complementary Act.

The State raised the issue in its argument before the district court, and the district court, at least arguably, addressed the issue in its first Memorandum Decision and Order. Also, both parties have fully briefed this issue before this Court. Therefore, this Court finds that Maybee's argument, that the Indian Commerce Clause preempts application of the Complementary Act to Maybee, was not waived.

### 2. Preemption

Maybee contends that, in seeking to apply the Complementary Act and the MAA to Maybee, the State of Idaho is attempting to regulate a tribal member's on-reservation activity, and that this automatically raises the issue of federal preemption under the Indian Commerce Clause.

The Indian Commerce Clause arises from the same constitutional text as the Interstate Commerce Clause; Article I, Section 8, clause 3, of the United States Constitution grants Congress the power "[t]o regulate Commerce . . . with the Indian Tribes."  In *Cotton Petroleum Corp. v. New Mexico*, the United States Supreme Court pointed out the key difference between applications of the Interstate Commerce Clause and the Indian Commerce Clause:

> It is also well established that the Interstate Commerce and Indian Commerce Clauses have very different applications.  In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs.  The extensive case law that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause. . . . [T]he fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce "among" States with mutually exclusive territorial jurisdiction to trade "with" Indian tribes.

490 U.S. 163, 192 (1989) (internal citations omitted).

In *White Mountain Apache Tribe v. Bracker*, the Supreme Court noted that traditionally a sense of tribal self-government and limited autonomy has provided the backdrop for deciding cases under the Indian Commerce Clause.  448 U.S. 136, 142-43 (1980).  The semi-independent position of the Indian tribes, coupled with the power of Congress to regulate tribal affairs has caused the Supreme Court to find that there are two ways in which State regulation over tribal reservations and members can violate the Indian Commerce Clause.  *Id.* at 142.  "First, the exercise of such authority may be pre-empted by federal law.  Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'"  *Id.*  (internal citations omitted) (quoting *Williams v. Lee*, 358 U.S. 217, 220 (1959)).

An express congressional statement does not have to be made in order for a state law to be preempted under the Indian Commerce Clause; however, before a state regulation is preempted, the regulatory interests of the state should be given consideration, "and 'automatic

16

exemptions "as a matter of constitutional law"' are unusual." *Id*. at 144 (quoting *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 481 n.17 (1976)).

In determining how to analyze any state statute that allegedly is in conflict with the Indian Commerce Clause, it is crucial to determine, as a preliminary inquiry: (1) whether the regulated conduct occurs on or off a reservation; (2) whether or not the party being regulated is a tribal member; and (3) if the conduct being regulated does occur on a reservation, whether State interests outside the reservation are implicated.

"Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973). Conversely, "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *Bracker*, 448 U.S. at 144. "When, however, state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land." *Nevada v. Hicks*, 533 U.S. 353, 362 (2001). The cases that the Supreme Court has deemed the most difficult are those in which a state seeks to regulate the activities of a non-Indian engaging in activities upon a reservation; in that instance the Court employs a "particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Bracker*, 448 U.S. at 145.

In this case, both the Complementary Act and the MAA (collectively "the Acts") regulate the activities of Maybee, a member of the Seneca Nation. However, contrary to Maybee's contentions, the Acts do not regulate Maybee's on-reservation activities, but rather his off-reservation conduct of: (1) selling, and offering for sale, Noncompliant Cigarettes in Idaho; and (2) selling, and offering for sale, tobacco products in Idaho without having first obtained a tobacco permit. Whether Maybee delivers Noncompliant Cigarettes to Idaho consumers personally, or through a common carrier, this conduct is ultimately traceable to Maybee. Idaho Code § 39-8403(3) is concerned with the introduction of Noncompliant Cigarettes into Idaho, and I.C. § 39-5704(1) is concerned with the introduction of any tobacco products into Idaho by anyone not first obtaining a tobacco permit. There is no conflicting federal law that would prevent the State of Idaho from regulating how tobacco may be sold or offered for sale in Idaho.

17

As for whether the Acts infringe upon the sovereignty of the Seneca Nation of Indians, one case from the Supreme Judicial Court of Maine is particularly instructive on this point.

In *Department of Health and Human Services v. Maybee*, 965 A.2d 55 (Me. 2009), the Court considered whether application of Maine's tobacco vendor license statute to Maybee was in violation of the Indian Commerce Clause. Maybee contended in that case, as in this case, that sales took place on reservation land, as his customer's offers to purchase were accepted by Maybee while on the reservation. *Id.* at 56. In rejecting this argument the Court held, "Maybee, as a delivery seller, engages in activity that reaches beyond the reservation when he accepts orders from and sends cigarettes to consumers who are off the reservation." *Id.* The Court went on to find that "[t]he balancing test described in [*Bracker*] and *Wagnon* is inapplicable to the present case because Maybee's interactions with consumers in Maine extend beyond the boundaries of the reservation." *Id.* at 57.

Where the regulated conduct occurs off-reservation, application of the *Bracker* balancing test is inappropriate. *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 110 (2005) ("We have applied the balancing test articulated in *Bracker* only where 'the legal incidence of the tax fell on a nontribal entity engaged in a transaction with tribes or tribal members,' on the reservation." (internal quotation omitted) (*quoting Arizona Dep't of Revenue v. Blaze Constr. Co.*, 526 U.S. 32, 27 (1999))). Here, the regulated conduct occurred off-reservation, and so the *Bracker* balancing test does not apply.

This Court holds that the Acts are non-discriminatory statutes regulating the off-reservation conduct of a Native American, and as there is no conflicting federal law, the Acts are not preempted by the Indian Commerce Clause.

**D.  The State is entitled to attorney fees on appeal.**

The State has requested attorney fees on appeal, in accordance with I.C. § 39-8407(5) of the Complementary Act, which provides, "[i]n any action brought by the attorney general to enforce this chapter, the attorney general shall be entitled to recover the costs of investigation, expert witness fees, costs of the action and reasonable attorney's fees." Maybee contends that attorney fees may not be awarded under this statute for two reasons:  (1) the statute appears to allow the attorney general to recover attorney fees regardless of the ultimate success or failure of his suit, and (2) the provision does not allow Maybee the possibility of collecting attorney fees if he is the prevailing party.

18

Although I.C. § 39-8407(5) does not, on its face, require the attorney general to be the prevailing party in order to recover attorneys fees and costs for actions brought in an effort to enforce the Complementary Act, we interpreted it as such. This is the first time this Court has interpreted I.C. § 39-8407(5). As noted above, rules of statutory construction dictate that a reviewing court shall not interpret a statute in a manner that leads to an absurd result, *In re Daniel W.*, 145 Idaho 677, 680, 183 P.3d 765, 768 (2008), and the legislature in drafting a statute is charged with knowledge of applicable statutory background and legal precedent. *Druffel v. State, Dep't of Transp.*, 136 Idaho 853, 856, 41 P.3d 739, 742 (2002). This Court is unable to find a single instance in the entire history of this state, and indeed the nation, where the non-prevailing party was awarded attorney fees. To hold otherwise would encourage absurd results. For example, reading I.C. § 39-8407(5) as allowing the attorney general to recover for attorney fees regardless of whether or not the attorney general ultimately prevails would lead to an absurd result wherein the attorney general could recover attorney fees for a lawsuit he brought frivolously and litigated in bad faith. The legislature clearly could not have intended to provide the attorney general with the means to recover attorney fees for an unmeritorious lawsuit. Therefore, we interpret Idaho Code § 39-8407(5) as only permitting the attorney general to recover attorney fees when the attorney general is the prevailing party.

As to Maybee's second contention, that the statute may not be enforced if it does not provide for the possibility of mutual recovery (i.e. that since Maybee could not recover under the statute if he were the prevailing party, the statute cannot be enforced) this argument has no basis in law. In *Gonzalez v. Thacker*, this Court interpreted I.C. § 12-120(4), as allowing recovery of attorney fees for plaintiffs in personal injury cases, but not for defendants. No. 34534, 2009 WL 129671, at *5 (Idaho Jan. 21, 2009).

As the State is the prevailing party on appeal, it is entitled to attorney fees, in accordance with Idaho Code § 39-8407(5).

## V. CONCLUSION

In summary, we affirm the district court's grant of summary judgment in favor of the State, finding that: (1) the Complementary Act applies to both intrastate and interstate sellers of Noncompliant Cigarettes; (2) Maybee sold, and offered for sale, Noncompliant Cigarettes, in violation of the Complementary Act; (3) the Interstate Commerce Clause does not preempt application of the Complementary Act to Maybee; (4) Maybee sold tobacco products in Idaho

19

without first obtaining an Idaho tobacco permit, in contravention of the MAA; and (5) the Indian Commerce Clause does not preempt application of either the Complementary Act or the MAA to Maybee. Attorney fees and costs to the State.

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**